**CONTINENTAL TREND RESOURCES, INC.; Harold G. Hamm, Trustee of the Harold G. Hamm Revocable Inter Vivos Trust; Gary H. Wright; Cindy Wright; Jeffrey B. Hume; and Farrar Oil Company, Plaintiffs–Appellees/Cross–Appellants,**

v.

**OXY USA INC., Defendant–Appellant/ Cross–Appellee.**

Nos. 92–6350, 92–6384.

United States Court of Appeals,
Tenth Circuit.

Nov. 26, 1996.

Theodore B. Olson, Theodore J. Boutrous, Jr., and Mark Snyderman of Gibson, Dunn & Crutcher, Washington, D.C.; David G. Palmer of Gibson, Dunn & Crutcher, Denver, CO; W. DeVier Pierson and Mark E. Greenwold of Pierson Semmes and Bemis, Washington, D.C.; Robert F. Hill and Ronald L. Wilcox of Hill & Robbins, Denver, CO, for Defendant–Appellant/Cross–Appellee.

Burck Bailey, Eric S. Eissenstat and Dino E. Viera of Fellers, Snider, Blankenship, Bailey & Tippens, Oklahoma City, OK; Randy Moeder, General Counsel, Continental Trend Resources, Inc., Enid, OK; Allan DeVore, Oklahoma City, OK, for Plaintiffs–Appellees/Cross–Appellants.

Before McWILLIAMS and LOGAN, Circuit Judges, and BROWN, District Judge.*

OPINION ON REMAND

LOGAN, Circuit Judge.

I

This matter is before us on remand from the United States Supreme Court. In our original opinion, *Continental Trend Resources, Inc. v. OXY USA Inc.*, 44 F.3d 1465 (10th Cir.1995), we upheld a compensatory damages award of $269,000 and a punitive damages award of $30,000,000—based on tort claims for interference with contracts and prospective business advantage—rejecting various contentions of error made by defendant OXY USA Inc. The Supreme Court vacated our judgment, *OXY USA Inc. v. Continental Trend Resources, Inc.*, —— U.S. ——, 116 S.Ct. 1843, 134 L.Ed.2d 945 (1996), and remanded for further consideration in light of its recent decision in *BMW of North America, Inc. v. Gore*, —— U.S. ——, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

---

* The Honorable Wesley E. Brown, Senior United States District Judge, United States District Court for the District of Kansas, sitting by designation.

*BMW*, at the Supreme Court level, involved only whether the punitive damages award at issue there imposed a grossly excessive punishment in violation of the Due Process Clause of the Fourteenth Amendment. We therefore consider the only issue before us on remand to be whether the $30 million punitive damages award in the instant case is grossly excessive in violation of the federal constitution.[1]

In *BMW*, the Supreme Court held that a $2 million punitive damages award based on BMW's fraud in failing to disclose to a purchaser that his new car had been repainted, was "grossly excessive" and thus unconstitutional. *Id.* at ———————, 116 S.Ct. at 1602–04. The *BMW* opinion expressly set out "to illuminate 'the character of the standard that will identify constitutionally excessive awards' of punitive damages." *Id.* at ———, 116 S.Ct. at 1595 (quoting *Honda Motor Co. v. Oberg*, 512 U.S. 415, ———, 114 S.Ct. 2331, 2335, 129 L.Ed.2d 336 (1994)). The Court began by pointing out that because a punitive damages award must be based on the state's legitimate interest in "punishing unlawful conduct and deterring its repetition," a reviewing court must analyze the punitive award in terms of conduct occurring within the state. *Id.* at ——————, 116 S.Ct. at 1595–97. Any economic penalties the state inflicts "must be supported by the State's interest in protecting its own consumers and its own economy." *Id.* at ———, 116 S.Ct. at 1597. The *BMW* Court listed as additional requirements that a person receive fair notice "not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose." *Id.* at ———, 116 S.Ct. at 1598. The Court then provided three "guideposts" for determining whether a defendant had adequate notice of the size of the sanction that a state might impose for a defendant's misconduct. *Id.* at ——————, 116 S.Ct. at 1598–99.

The first and "[p]erhaps the most important" guidepost is "the degree of reprehensibility of the defendant's conduct." *Id.* at

———, 116 S.Ct. at 1599 (footnote omitted). "The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *Id.* at ———, 116 S.Ct. at 1601. The third guidepost is a comparison of the punitive damages award with "the civil or criminal penalties that could be imposed for comparable misconduct." *Id.* at ———, 116 S.Ct. at 1603.

In concluding the punitive damages award was grossly excessive, the Court stated that

> [t]he fact that BMW is a large corporation rather than an impecunious individual does not diminish its entitlement to fair notice of the demands that the several States impose on the conduct of its business. Indeed, its status as an active participant in the national economy implicates the federal interest in preventing individual States from imposing undue burdens on interstate commerce.

*Id.* at ———, 116 S.Ct. at 1604. The Court then remanded to the Alabama Supreme Court for it to determine whether there should be a new trial or an independent determination by that court of the amount necessary to vindicate Alabama's economic interests.

*BMW* is the first case in modern times in which the Supreme Court has found a punitive damages award to be so excessive that it violates the substantive component of the Due Process Clause. *See id.* at ——— n. 41, 116 S.Ct. at 1604 n. 41. In reaching its conclusion the Court clarified in several respects the legal standards to be applied. We now review the Supreme Court's opinion and reanalyze the award in the instant case under these standards.

## II

 First, the punitive damages award must relate to conduct occurring within the state—here, Oklahoma. A state may not

---

1. Defendant OXY USA Inc. (OXY) has moved to have oral argument, a request opposed by plaintiffs. After review the panel unanimously determined that the "facts and legal arguments are adequately presented in the briefs and record

and the decisional process would not be significantly aided by oral argument." Fed. R.App. P. 34(a). We therefore deny OXY's request for oral argument.

sanction a tortfeasor "with the intent of changing the tortfeasor's lawful conduct in other States." —— U.S. at ——, 116 S.Ct. at 1597. Thus, any penalty must be supported by Oklahoma's "interest in protecting its own consumers and its own economy." *Id.* Of course, unlike in *BMW*, OXY's conduct in the case before us would be tortious in any state. The *BMW* Court goes on to state that it "need not consider whether one State may properly attempt to change a tortfeasor's unlawful conduct in another State." *Id.* at —— n. 20, 116 S.Ct. at 1598 n. 20. Despite this comment we read the opinion to prohibit reliance upon inhibiting unlawful conduct in other states. The Court states that evidence of out-of-state transactions is not irrelevant; "such evidence is relevant to the determination of the degree of reprehensibility of the defendant's conduct." *Id.* at —— n. 21, 116 S.Ct. at 1598 n. 21.

▮ In the instant case only acts of OXY within Oklahoma were introduced to support plaintiffs' tort claims. There were references to the effect that OXY had approxi-mately 6,000 contracts like that at issue in this case. There is no indication in the record whether any of the 6,000 contracts were in states other than Oklahoma. OXY had only about 500 contracts at Rodman, however, and plaintiffs had 140 wells connected to the Rodman gas gathering system. The total number of contracts, some of which might have been in other states, could have influenced the amount of the punitive award, as the jury instruction did not limit the jury's consideration to Oklahoma activities.[2] OXY objected to certain aspects of the instruction, *see* II Appellant's App. 426–37, but not to its failure to limit the jury to consideration of OXY's presence in Oklahoma.

The evidence here focused on OXY's Oklahoma activities, particularly in connection with the Rodman plant. With hindsight provided by the *BMW* opinion it might have been desirable to instruct the jury to restrict its consideration to Oklahoma's "interest in protecting its own [citizens] and its own economy." —— U.S. at ——, 116 S.Ct. at 1597.

**2.** The instruction in its entirety is as follows:

In addition to actual damages, the law permits you, under certain circumstances, to award what are known as "punitive" or "exemplary" damages. Such damages are awarded in proper and specified instances in order to punish a wrongdoer for some extraordinary misconduct, and to serve as an example or warning to others not to engage in similar conduct.

If you find in favor of plaintiffs on their tortious interference with an existing contract claim, their tortious interference with expected contractual business relations claim, or both, then you may award plaintiffs punitive damages. Punitive damages are not to be construed as compensation to the prevailing party but, as stated, punishment for misconduct and as an example to others to deter them from like conduct.

For a party to recover punitive damages, it must be shown that the acts complained of were oppressively, wantonly, or maliciously done. An act is maliciously done if prompted or accompanied by hatred, ill will, or spite toward the injured person individually. Note that malice in this instruction is different from the kind of malice defined under plaintiffs' cause of action. An act is wantonly done if done in a reckless or callous disregard of, or indifference to, the rights of the injured person. An act is oppressively done if done in any way or manner which injures, damages, or otherwise violates the rights of another person with unnecessary harshness or severity, as by misuse or abuse of authority or power, or by taking advantage of some weakness, disability or misfortune of another person.

Although an award of punitive damages is a matter exclusively within the province of the jury, you should always bear in mind the conditions under which punitive damages may be awarded and the purpose for which the law permits an award of punitive damages to be made. In addition, punitive damages must be awarded with sound reason and calm discretion. You should never award punitive damages because of sympathy, bias or prejudice. You are further instructed that there is no exact rule by which to determine the amount of punitive damages. While punitive damages must bear some relation to the injury caused by the offensive conduct as well as the conduct itself, they do not necessarily bear any relation to the amount you awarded as actual damages.

If you find in favor of the plaintiffs on their tortious interference with existing contract claim and tortious interference with expected contractual business relations claim, and if you should further find that in committing the acts complained of, the act was done oppressively, wantonly, or maliciously, then you may award punitive damages in such an amount as you deem is warranted by the evidence.

In assessing punitive damages, you may consider defendant's net worth as one of many factors.

II Appellant's App. 528–30.

But we do not think the evidence here required such an instruction.

## III

Second, a defendant must receive "fair notice ... of the conduct that will subject him to punishment." —— U.S. at ——, 116 S.Ct. at 1598. *BMW* did not discuss this requirement except in the context of the severity of the penalty the defendant might expect.

In the instant case we have no difficulty with this requirement. It has long been established in Oklahoma and elsewhere that tortious behavior that is particularly egregious will warrant punitive damages. *See, e.g., Marshall v. El Paso Natural Gas Co.,* 874 F.2d 1373 (10th Cir.1989); *Timmons v. Royal Globe Ins. Co.,* 653 P.2d 907 (Okla. 1982). An Oklahoma statute in force when the instant case arose permitted punitive damages to exceed the amount of the actual damages if the judge made a finding of "clear and convincing evidence that the defendant is guilty of conduct evincing a wanton or reckless disregard for the rights of another, oppression, fraud or malice, actual or presumed." Okla. Stat. tit. 23, § 9 (1986). There is no question but that OXY had fair notice that punitive damages could be awarded if plaintiffs proved the contentions in their complaint to the satisfaction of the jury.

## IV

Third, defendant must receive "fair notice ... of the severity of the penalty that a State may impose." —— U.S. at ——, 116 S.Ct. at 1598. It is with respect to this requirement that the Supreme Court set forth its three "guideposts:" (1) the degree of reprehensibility of the defendant's conduct, (2) the ratio of the punitive award to the actual harm inflicted on the plaintiff, and (3) the comparison between the punitive award and the civil or criminal penalties that could be imposed for comparable misconduct.

## A

The Supreme Court tagged as "[p]erhaps the most important indicium of the reasonableness of a punitive damages award" "the degree of reprehensibility of the defendant's conduct." *Id.* at ——, 116 S.Ct. at 1599. In reviewing the enormity of an offense we must accept that "some wrongs are more blameworthy than others." *Id.* Purely economic harm may warrant less punishment than harm to the health or safety of individuals. But "infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, or when the target is financially vulnerable, can warrant a substantial penalty." *Id.* (citations omitted).

Also relevant is whether "a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful." *Id.* "[A] recidivist may be punished more severely than a first offender." *Id.* Out-of-state acts may be used to show the degree of reprehensibility of a defendant's conduct. *Id.* at —— n. 21, 116 S.Ct. at 1598 n. 21. Other circumstances to consider include whether the defendant's conduct is lawful in another state, and whether the defendant "persisted in a course of conduct after it had been adjudged unlawful" on at least one occasion. *Id.* at ——, 116 S.Ct. at 1601. "[T]he omission of a material fact may be less reprehensible than a deliberate false statement." *Id.* Thus, among the questions we ask are whether a defendant's behavior: causes economic rather than physical harm; would be considered unlawful in all states; involves repeated acts rather than a single one; is intentional; involves deliberate false statements rather than omissions; and is aimed at a vulnerable target.

In our original opinion we rejected OXY's assertion that a purely economic injury necessarily provides less support for a substantial punitive damages award than a personal injury. *See* 44 F.3d at 1478. Although the *BMW* Court stated that certain inflictions of economic injury would warrant a "substantial penalty," —— U.S. at ——, 116 S.Ct. at 1599, it does appear to regard torts causing only economic injury as less worthy of large punitive damages awards than torts inflicting injuries to health or safety. The instant case contains almost all of the other indicia of reprehensibility: OXY's actions, as found by the jury, would be condemned universally. The jury and the district court found that

OXY intentionally interfered with plaintiffs' existing and prospective contracts; there was evidence that OXY withheld payments owed to plaintiffs to induce them to change their position and altered internal documents containing statements damaging to OXY. *See* 44 F.3d at 1479; VIII Appellant's App. 2738–39.

OXY argues that it did not engage in repeated misconduct toward plaintiffs, or with other producers; but the record contains evidence that OXY used some of the same tactics with other producers in the same gas field as plaintiffs. *See* VIII Appellant's App. 2738–39; I Appellees' App. 131, 260; II *id.* at 633–40. Further, the district court observed that the jury was "visibly reactive to" the testimony of OXY's corporate representative that "'we cannot let [plaintiffs] get away with this or everybody else will try to do it [bypass Rodman].' It was a 'the natives are restless we better get out there and subdue them' kind [of] presentation." VIII Appellant's App. 2738–39. The district court noted that "[c]oercing weaker competitors to keep them in their place was OXY's method of conducting business," 810 F.Supp. at 1530; *see also* VII Appellee's App. 2457–59, and that "[t]he jury was obviously moved by the repugnancy of the totality of OXY's conduct." 810 F.Supp. at 1530. There is evidence in the record to support plaintiffs' financial vulnerability; the district court noted plaintiffs' claim that their business was almost decimated by OXY's actions. *See id.* at 1528–31.

There is sufficient evidence in the record of the reprehensibility of OXY's conduct to support a "substantial penalty." The appropriate penalty is no doubt below what would be justified if OXY's conduct caused loss of life, widespread health hazards, or major environmental injury. But this is not a case like *BMW* where the Court found "no deliberate false statements, acts of affirmative misconduct, or concealment of evidence of improper motive." *Id.* at ——, 116 S.Ct. at 1601.

**B**

The ratio of punitive damages "to the actual harm inflicted on the plaintiff" is the sec-ond guidepost. —— U.S. at ——, 116 S.Ct. at 1601. The *BMW* Court referred to its previous statement that a punitive award more than four times the compensatory award was "'close to the line.'" *See id.* at ——, 116 S.Ct. at 1602 (quoting *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 23–24, 111 S.Ct. 1032, 1046–47, 113 L.Ed.2d 1 (1991)). The Court then acknowledged that *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), had refined this analysis, to make the proper inquiry "'"whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred."'" —— U.S. at ——, 116 S.Ct. at 1602 (quoting *TXO,* 509 U.S. at 460, 113 S.Ct. at 2721) (quoting *Haslip,* 499 U.S. at 21, 111 S.Ct. at 1045). In *TXO* the Supreme Court upheld a punitive award 526 times greater than the compensatory award. But in *BMW* it justified that decision by stating that "in upholding the $10 million award in *TXO,* we relied on the difference between that figure and the harm to the victim *that would have ensued if the tortious plan had succeeded.* That difference suggested that the relevant ratio was not more than 10 to 1." *Id.* (emphasis added).

The Court acknowledged that "low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Id.* at ——, 116 S.Ct. at 1602. In rejecting the award in *BMW* the Court noted that there was "no suggestion that [the plaintiff] or any other BMW purchaser was threatened with any additional potential harm." *Id.*

From this discussion we surmise that in economic injury cases if the damages are significant and the injury not hard to detect, the ratio of punitive damages to the harm generally cannot exceed a ten to one ratio. In figuring harm both actual and potential

harm may be considered. But it must be harm to these plaintiffs, not to others. The *BMW* opinion is somewhat confusing by its several references discussing ratios in the context of all fourteen of the Alabama purchasers of repainted new cars rather than to the single plaintiff in that case. But the *BMW* opinion stated more than once that the relevant ratio was "to the actual harm inflicted on the plaintiff." *Id.* at ——, 116 S.Ct. at 1601; *see also id.* at ——, 116 S.Ct. at 1602 ("harm to the victim"); *id.* at —— n. 34, 116 S.Ct. at 1602 n. 34 ("potential loss to respondents") (quoting *TXO,* 509 U.S. at 462, 113 S.Ct. at 2722).

The *BMW* case itself might qualify for a greater ratio than ten to one, because the actual damages were small, only $4,000, even though there was no additional potential harm to the plaintiff. But in the case before us the jury found compensatory damages of $269,000, a significant sum. And the potential damages to these plaintiffs had OXY's course of action succeeded was substantially more.

Plaintiffs produced expert evidence not focused specifically upon their potential loss, but which would support a jury finding of approximately $1,000,000 in combined actual and potential loss. The affidavit of expert John Brickhill related that seventy-nine producing wells of plaintiffs were attached to the Rodman gathering system and averaged 44.5 Mcf production per day. II Appellees' App. 653, 669. He projected production for three years, apparently the average life of these wells. *Id.* at 666 ("production from wells in the Sooner Trend typically declines 50% or more the first year and 20% to 47% annually over the life of the reserves"). He also estimated the penalty for bypassing the Rodman plant at twenty cents per Mcf. *Id.* at 651–52. Using those figures (79 × 44.5 Mcf per day × 3 years × .20 per Mcf) the potential future cost to plaintiffs would be $769,895. That amount added to the $269,000 compensatory damages awarded for past harm would exceed $1,000,000.

The jury could have arrived at a higher figure using OXY's evidence on its counterclaim. One of its experts, Dr. Carlos M. Royo, estimated the post–1990 production

from plaintiffs' wells attached to the Rodman system over the wells' remaining life at 8,514,758 Mcf. VI Appellees' App.2031. OXY's expert, John Wilson, using this figure, asserted that OXY was deprived of "lost proceeds" of $3,242,800. VIII *id.* at 2643–44, 2718. OXY sought this sum for its damages, but its expert did not reduce the figure by any expenses of operating the Rodman plant. *Id.* at 2644. There was other evidence, however, that operating expenses plus depreciation would be in the range of eighteen cents per Mcf. *See* III *id.* at 849; V *id.* at 1513. There were other indications that eighteen to twenty cents per Mcf was a reasonable cost. *See* III *id.* at 1048; V *id.* at 1573; VII *id.* at 2330. Subtracting eighteen cents per Mcf from $3,242,800 would give a potential future profit figure of $1,710,144. When added to the actual damages figure awarded by the jury the total actual and potential profit had OXY succeeded would be near $2,000,000.

### C

The third "indicium of excessiveness" is provided by "[c]omparing the punitive damages award and the civil or criminal penalties" for comparable misconduct. —— U.S. at ——, 116 S.Ct. at 1603. This was relatively straightforward in *BMW,* where Alabama and many states had limited criminal and civil fines for deceptive trade practices and other offenses similar to those at issue there.

The *BMW* Court determined that the punitive award was grossly in excess of civil or criminal penalties that could have been imposed on the defendant for similar conduct. OXY argues that likewise, when the instant case arose no Oklahoma statutes provided fines for similar conduct that would even approach $30 million. *See, e.g.,* 52 Okla. Stat. § 47.6A (1984) (penalty for violating Hazardous Liquid Transportation System Safety Act no more than $1,000 a day up to maximum of $200,000); 15 Okla. Stat. § 761.1(b) (1988) (unconscionable violation of Consumer Protection Act provides penalty of no more than $2,000). OXY also asserts that if plaintiffs had proven their antitrust claim (which was dismissed by the district court) the penalty would have been only $538,000. *See* 15

U.S.C. § 15(a) (treble damages in antitrust cases).

Plaintiffs argue that OXY's "scheme" affected interstate commerce and could have been punished under federal racketeering laws with lengthy prison sentences and multimillion-dollar fines, but we see no basis for those criminal penalties. There was evidence, however, of corporate employees altering documents to further OXY's interest. In such circumstances OXY would be liable for the offenses of its agents. *See* USSG ch. 8, intro. comment. Generally corporations are punished by restitution and fines. *Id.* §§ 8B1.1, 8C1.1. Analogous crimes, for purposes of determining a proper fine, would be fraud, deceit and forgery, under which the court would determine the base offense level, *see id.* § 2F1.1, for which OXY could be subject to a very large fine. *Id.* § 8C2.4.

The analysis of the potential penalties highlights one of the many factual differences between *BMW* and the instant case; OXY's misconduct involved a violation of common law tort duties that do not lend themselves to a comparison with statutory penalties. The fundamental question is whether OXY had reasonable notice that its tortious interference with contracts and prospective business advantage could result in such a large punitive award. Plaintiffs point to cases from other states involving very large punitive awards. *See, e.g., Texaco, Inc. v. Pennzoil Co.,* 729 S.W.2d 768 (Tex.App. 1987), *cert. dismissed,* 485 U.S. 994, 108 S.Ct. 1305, 99 L.Ed.2d 686 (1988) ($1 billion tortious interference); *Central Tele. Inc. v. TCI Cablevision, Inc.,* 800 F.2d 711, 732 (8th Cir. 1986), *cert. denied,* 480 U.S. 910, 107 S.Ct. 1358, 94 L.Ed.2d 528 (1987) ($25 million tortious interference). Those cases, together with cases involving large awards in Oklahoma, *see, e.g., Timmons v. Royal Globe Ins. Co.,* 653 P.2d 907, 909, 919 (Okla.1982) (remittitur to $1.5 million punitives; one to four ratio); *Marshall v. El Paso Natural Gas Co.,* 874 F.2d 1373 (10th Cir.1989) ($5 million in oil and gas well capping case), provided sufficient notice to OXY of the potential for large punitive awards.

Finally, we note that the Supreme Court in *BMW* downplayed the defendant's wealth as a justification for increasing punitive damages, by emphasizing that its status as a large active participant in the national economy "implicates the federal interest" in prohibiting states from unduly burdening interstate commerce and "imposing its regulatory policies on the entire Nation." *Id.* at ——, 116 S.Ct. at 1604. The *BMW* Court also places in the constitutional calculus the question of the minimum level of penalty necessary to achieve the state's goal of deterrence. *See* —— U.S. at ——, 116 S.Ct. at 1603 ("The sanction imposed in this case cannot be justified on the ground that it was necessary to deter future misconduct without considering whether less drastic remedies could be expected to achieve that goal. The fact that a multimillion dollar penalty prompted a change in policy sheds no light on the question whether a lesser deterrent would have adequately protected the interests of Alabama consumers.").

■ OXY argues that in our previous opinion we upheld the punitive award because of its wealth, and that *BMW* "teaches that net worth will not sustain the gross imbalance between punitive and actual damages" in the instant case. *See* Brief of OXY USA Inc. on Remand from the United States Supreme Court at 24. We do not read the Court's statements to mean that the wealth of the defendant is irrelevant. From the Court's statements we conclude that a large punitive award against a large corporate defendant may not be upheld on the basis that it is only one percent of its net worth or a week's corporate profits. Yet wealth must remain relevant, because $50,000 may be awesome punishment for an impecunious individual defendant but wholly insufficient to influence the behavior of a prosperous corporation. The Supreme Court's opinion seems to ask for the least punishment that will change future behavior; but that is difficult to apply as a constitutional principle. Still, in commercial litigation like that before us the actual and potential damages are likely to be substantial, and thus punitive damages awarded on even a modest multiplier gener-

ally will be enough to gain the defendant's attention and alter its future behavior. This is especially so considering the probability that the defendant's continued misbehavior surely would generate additional lawsuits.

■ We mention another factor relevant to wealth that we believe may be considered in setting and reviewing punitive awards in particular circumstances. A rich defendant may act oppressively and force or prolong litigation simply because it can afford to do so and a plaintiff may not be able to bear the costs and the delay. We have held that the costs of litigation to vindicate rights is an appropriate element to consider in justifying a punitive damages award. *O'Gilvie v. International Playtex, Inc.*, 821 F.2d 1438, 1447 (10th Cir.1987), *cert. denied*, 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 601 (1988).

In the instant record there is evidence that OXY thought it could impose its corporate will on plaintiffs. To secure compensatory damages of $269,000 plaintiffs had to engage in litigation resulting in a three-week trial and an appellate record of approximately 7,000 pages. They had to defend the jury's verdict in post-trial district court proceedings, in an appeal to this court and to the Supreme Court, and again in this court on remand. On any reasonable hourly fee basis plaintiffs' legal costs no doubt exceed their compensatory damages award. Nothing in *BMW* would appear to prohibit consideration of the cost of those legal proceedings in determining the constitutionally permissible limits on the punitive damages award.

## VI

In summary, we are satisfied that a significant punitive damages award against OXY is proper and constitutionally permissible. With the guidance of the *BMW* opinion, however, we conclude that $30,000,000 exceeds the constitutional limit. The harm in this case, though egregious, was entirely economic, and thus less worthy of punishment than harm to health and safety. Further, the ratio between the award and the harm to these plaintiffs—both actual and potential— is too large. OXY's wealth is not irrelevant, but $30,000,000 is far more than is necessary

to secure its attention and modify its behavior in Oklahoma.

In *BMW* the Supreme Court remanded to the Alabama Supreme Court for it to determine whether to order a new trial or make its own determination "of the award necessary to vindicate the economic interests of Alabama." —— U.S. at ——, 116 S.Ct. at 1604. OXY asks this court to either "set aside or significantly reduce[ ]" the punitive damages award. Brief of OXY USA Inc. on Remand from the United States Supreme Court at 25. The question thus becomes whether we should remand to the district court to determine the amount of a remittitur or whether we should determine the amount of remittitur ourselves. Plaintiffs cite *Gasperini v. Center for Humanities, Inc.*, —— U.S. ——, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996), a post-*BMW* decision that it argues limits our options. *Gasperini* held that in federal court diversity cases, applying state law, the Seventh Amendment prohibits the Court of Appeals from redetermining a fact issue decided by a jury. Rather the appeals court must apply an abuse of discretion standard to the district court's post-trial ruling, and if it reverses must remand the case to the district court so that it may revisit its prior ruling. *Id.* at ——, 116 S.Ct. at 2225. Compensatory damages were at issue in *Gasperini*, but the decision would apply the same standard to punitive damage awards. *See id.* at —— n. 18, 116 S.Ct. at 2223 n. 18; *see also id.* at —— n. 12, 116 S.Ct. at 2221 n. 12; *id.* at —— n. 4, 116 S.Ct. at 2228 n. 4 (Stevens, J., dissenting).

■ In the case before us, however, we would not be redetermining a fact issue found by a jury. We ascertain no error of law in the instructions to the jury, nor in the jury's factfinding. Rather we have concluded, aided by the intervening *BMW* case, that the jury's punitive damages award was so excessive it violated the substantive element of the Due Process Clause of the Federal Constitution. This is a federal constitutional issue. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938) ("*Except in matters governed by the Federal Constitution* or by Acts of Congress, the law to be applied in any case is the law of the

state.") (emphasis added); *see also Gasperini*, —— U.S. at ——, 116 S.Ct. at 2235 (Scalia, J., dissenting) (asserting that "the level of punitive damages is not really a 'fact' 'tried' by the jury"). We do not believe *Gasperini* prevents us from determining in the first instance the amount of remittitur, because the issue of how much of the $30,000,000 award the United States Constitution allows is one of constitutional fact that the appellate courts have the power to decide. *See Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 501 n. 17, 104 S.Ct. 1949, 1960 n. 17, 80 L.Ed.2d 502 (1984) ("Regarding certain largely factual questions in some areas of the law, the stakes . . . are too great to entrust them finally to the judgment of the trier of fact.").

We now must determine the maximum constitutionally permissible punitive award based on our review of the record. This obviously is a difficult decision; we must arrive at a precise dollar figure by applying guidelines that contain no absolutes to facts that provide only imprecise potential damage amounts. Nevertheless, using our best judgment we determine that $6,000,000 is the maximum constitutionally permissible punitive damages award justified by the facts of this case. This amount is approximately six times the actual and potential damages plaintiffs suffered according to our best estimate of their proof. Thus it is within the range of a one to four to a one to ten ratio we believe *BMW* imposes in cases such as this—involving commercial litigation with substantial actual and potential damages. If we use OXY's own figures based upon its unsuccessful counterclaim, the award is only about three times our calculation of actual and potential damages, and only about twice what OXY attempted to establish on its counterclaim.

The $6,000,000 figure is sufficient to obtain OXY's attention, regardless of its wealth, and enough, we believe, to change its behavior in Oklahoma oil and gas fields. The figure is sufficient to cover plaintiffs' reasonable costs of litigation with enough left over to reward plaintiffs for pursuing a case the jury obviously thought justified significant punishment of OXY's behavior.

Thus, we order a remittitur reducing the punitive damages award to $6,000,000. Should plaintiffs decline to accept the reduced judgment, the district court is directed to grant a new trial limited to the punitive damages issue. *See Mason v. Texaco, Inc.*, 948 F.2d 1546, 1561 (10th Cir.1991), *cert. denied*, 504 U.S. 910, 112 S.Ct. 1941, 118 L.Ed.2d 547 (1992); *see also Morgan v. Woessner*, 997 F.2d 1244, 1258 (9th Cir.1993) ("To avoid any conflict with the Seventh Amendment, the preferable choice is to afford the party awarded the grossly excessive punitive damages, whether that is determined by a trial court or appellate court, the option of either accepting the remittitur of the punitive damages award or a new trial on that issue."), *cert. dismissed*, 510 U.S. 1033, 114 S.Ct. 671, 126 L.Ed.2d 640 (1994).

We AFFIRM and reinstate the district court's judgment, provided that plaintiffs accept a reduction in the punitive damages award to $6,000,000. We REMAND to the district court for further proceedings consistent with this opinion.

BROWN, Senior District Judge, dissenting:

I agree that the majority opinion fully and accurately sets out the factual background involved in this appeal. I also agree that in reconsidering our prior ruling in light of *BMW of North America, Inc. v. Gore*, 517 U.S. ——, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), as we have been directed to do by the Supreme Court upon remand, the majority opinion has thoroughly and correctly analyzed the "guidelines" that are to be found in that opinion. I must respectfully dissent, however, from the majority's ultimate conclusion that $6,000,000 is the maximum constitutionally permissible punitive damage award under the facts and law which govern this case.

It seems to me that our difficulty in applying the precepts of the *BMW* case stems from the factual aspect of that case which I find to be clearly distinguishable. It seems to me that the primary motivating factors in *BMW* were that there were no "aggravating factors" or particular reprehensible conduct by BMW present in the case, that the award

was 500 times the amount of the customer's actual harm, and that under Alabama law there was a lack of adequate "reasonable constraints" to guide the court and jury in determining the reasonableness of punitive awards.[3]

In the first instance, the award of punitive damages against OXY in our case did not in any way approach the 500 to 1 ratio which was so criticized in *BMW*.

Secondly, while the wrongful acts of BMW and OXY USA both resulted in economic injury to the complaining parties, the nature of the two wrongs is quite different. While BMW was found to be involved in what may be termed "deceptive trade practices" affecting the value of a new car and resultant damage to consumers, OXY USA was engaged in intentional conduct which was "particularly egregious" conduct which was deliberate and repetitive and designed to destroy a vulnerable competitor. As the majority has noted, the trial court found that the jury "visibly reacted" to OXY's corporate witness, and that "[t]he jury was obviously moved by the repugnancy of the totality of OXY's conduct." 810 F.Supp. at 1530.

Finally, and perhaps of most importance to me is the fact that, unlike Alabama, the State of Oklahoma has established an elaborate system of checks upon the discretion of courts and juries in the imposition of punitive damage awards. *See discussion, Capstick v. Allstate Ins. Co.*, 998 F.2d 810, at pp. 816 et seq. (10th Cir.1993).[4]

In our prior opinion, this panel determined that the original award of $30,000,000, when examined from the perspective of the facts surrounding OXY's conduct and of what would be necessary to punish a very wealthy corporation and to deter similar conduct, was "not necessarily a shocking figure"; and we declined to disturb the jury's award at that time.

In this opinion after remand, the majority has noted that plaintiffs produced evidence which would support a jury finding of approximately $1,000,000 in actual and potential loss, while OXY's own evidence would support a higher figure of $2,000,000. Since the majority further noted that "in economic injury cases if the damages are significant and the injury not hard to detect, the ratio of punitive damages to the harm generally cannot exceed a ten to one ratio," these damage figures alone would justify a punitive award of between $10 and $20 million. When the additional factor of the extent and nature of OXY's income and net worth is added as a consideration, one begins to approach the original jury award of $30 million, and this judge can only conclude that an award of not less than $20 million would be permissible and required under the circumstances found in this record without violation to the concepts of due process.[5]

In any event, this case clearly illustrates the difficulties which arise when the ultimate decision of whether to impose punitive damages, and the amount of those damages is taken from the discretion of a jury impanelled and instructed in accordance with the strict guidelines imposed by Oklahoma law.[6]

---

3. This aspect of Alabama law was discussed at length in the concurring opinion of Justice Breyer (O'Connor and Souter joining), —— U.S. at pp. —— et seq., 116 S.Ct. at pp. 1604 et seq., 134 L.Ed.2d at pp. 833 et seq.

4. In Oklahoma, a plaintiff is entitled to recover punitive damages in excess of his actual damages if the trial court determines, prior to submission of the case, "that there is clear and convincing evidence that the defendant is guilty of conduct evincing a wanton or reckless disregard for the rights of another, oppression, fraud or malice, actual or presumed," in which case the jury may award damages "for the sake of example, and by way of punishing the defendant, and the percentage limitation on such damages ... shall not apply." 998 F.2d at 817.

5. In our previous opinion in this case, we noted that OXY claimed that the $30 million punitive award was based upon passion and prejudice because in plaintiff's closing argument it was pointed out that OXY earned over $36 million a week. We there ruled that "... we cannot conclude on the record as a whole that the jury acted out of passion or prejudice."

6. It should be noted that in remanding the *BMW* case to the state court, the Supreme Court specifically noted that

"As in *Haslip*, we are not prepared to draw a bright line marking the limits of a constitutionally acceptable punitive damages award. Unlike that case, however, we are fully convinced that the grossly excessive award imposed in this case transcends the constitutional limit.

In my opinion, the *BMW* case does not apply to the facts and circumstances of this case, and we should reaffirm the punitive award found appropriate by the Oklahoma jury. If *BMW* does apply, then to give some credence to the Oklahoma jury's conclusions, we certainly should not reduce the punitive damage award below the $20 million figure disclosed by the evidence.

Whether the appropriate remedy requires a new trial or merely an independent determination by the Alabama Supreme Court of the award necessary to vindicate the economic interests of Alabama consumers is a matter that should be addressed by the state court in the first instance." (—— U.S. at ——, 116 S.Ct. at 1604, 134 L.Ed.2d at 833.)