I concur with the abandonment of the judicially created mechanisms of (1) the bifurcation of punitive-damages trials between liability and damages phases, and (2) the payment of a portion of punitive damages awards to the State of Alabama. I dissent, however, from the majority's pliant application of the federal due process standard for constraining awards of punitive damages and its failure to adopt a traditional state law reasonableness standard for constraining such awards.
An indispensable characteristic of a sound legal system is the production of predictable results, which guards against the arbitrary use of governmental power[7] and allows the *Page 536 
bench, the bar, and, most importantly, the people to order their affairs.[8] This Court's punitive damages jurisprudence has failed to produce predictable results.[9]
Justice Breyer observed in his concurrence in BMW of NorthAmerica, Inc. v. Gore, 517 U.S. 559, ___, 116 S.Ct. 1589, 1609,134 L.Ed.2d 809 (1996) ("BMW"), that this Court's pliant application of the standards set forth in Green Oil Co. v.Hornsby, 539 So.2d 218 (Ala. 1989), for constraining the amount of punitive damages awards, "violate[d] the basic guarantee of nonarbitrary governmental behavior that the Due Process Clause provides." While facially the Green Oil standards provided constraints on arbitrary punitive damages awards, see PacificMutual Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032,113 L.Ed.2d 1 (1991), as interpreted by this Court in BMW of NorthAmerica, Inc. v. Gore, 646 So.2d 619 (Ala. 1994) ("BMW I"), they in fact did not. Consequently, the Supreme Court of the United States, though not injecting itself into the determination of what would be the proper state law reasonableness standard, did establish a three-factor review for courts to use in determining whether punitive damages awards are so large that they clearly exceed the "outer limit" of federal due process.BMW, 517 U.S. at ___ _ ___, 116 S.Ct. at 1599-1604 (determining whether punitive damages awards are excessive under the Due Process Clause by assessing the reprehensibility of the defendant's conduct, the ratio of punitive damages to compensatory damages, and sanctions for comparable misconduct).
This constitutional outer limit necessarily offers only the broadest suggestion of what is impermissible. BMW, 517 U.S. at ___, 116 S.Ct. at 1602. It is incumbent on this Court to provide Alabama trial courts, and ultimately the public, with the guidance that will produce fair, consistent, and predictable results, within the broad range of constitutional acceptability. The majority opinion fails to provide this guidance.[10] *Page 537 
The majority recites the three due process guideposts and the Green Oil factors and restates the facts set forth in this Court's original opinion. See Life Ins. Co. of Georgia v.Johnson, 684 So.2d 685 (Ala. 1996) ("Johnson I"). Critically missing is the analytical connection to the $3 million punitive award. Until this Court provides a guiding rationale for trial courts and the bar, future punitive awards in Alabama may sometimes be lower, but will remain arbitrary.[11]
To provide a more predictable and ordered approach for the review of punitive damages awards, I would apply the more restrictive state law reasonableness analysis set forth in Justice Houston's special concurrence in BMW of North America,Inc. v. Gore, 701 So.2d 507 (Ala. 1997) ("BMW II"). Accordingly, I adopt the following language from that concurrence:
"The Origin of the Problem
"A
 "Before its decision in [BMW], the Supreme Court had never overturned a state court's award of punitive damages as violating federal due process requirements. The apparent reason for this is that state law reasonableness standards for determining the amount of the award had historically been stricter than the federal excessiveness standard. See Haslip, 499 U.S. at 17, 111 S.Ct. at 1043 ('So far as we have been able to determine, every state and federal court that has considered the question has ruled that the common-law method for assessing punitive damages does not in itself violate due process. . . . In view of this consistent history, we cannot say that the common-law method for assessing punitive damages is so inherently unfair as to deny due process . . . .') (citation omitted). As Justice Stevens noted in TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993):
 " '[W]e do not suggest that a defendant has a substantive due process right to a correct determination of the "reasonableness" of a punitive damages award. . . . [S]tate law
generally imposes a requirement that punitive damages be "reasonable." . . . A violation of a state law "reasonableness" requirement would not, however, necessarily establish that the award is so "grossly excessive" as to violate the Federal Constitution. Furthermore, . . . our cases have recognized for almost a century that the Due Process Clause of the Fourteenth Amendment imposes an outer limit on such an award. . . .'
 "509 U.S. at 458, n. 24, 113 S.Ct. at 2720, n. 24 (emphasis added). Thus, application of the stricter state law reasonableness standard has traditionally kept awards of punitive damages from exceeding the more liberal 'outer limit' imposed by the federal excessiveness standard.
"B
 "The state law reasonableness standard derives from the judicial mechanism of remittitur, which plays an integral role in the procedure for respecting and controlling the jury's function to punish tortfeasors. Common law judges traditionally accorded jury awards of punitive damages a rebuttable presumption of correctness. See, e.g., Leith v. Pope, 2 Black. W. 1327, 1328, 96 Eng. Rep. 777, 778 (C.P. 1779) ('[I]n cases of tort the Court will not interpose on account of the largeness of damages, unless they are so flagrantly excessive as to afford an internal evidence of the prejudice and partiality of the jury'). At some point, however, when the facts indicated that the presumption of correctness waned and was finally overcome, common law judges used remittitur to reduce unreasonable awards that resulted from the passion or prejudice of the jury. Numerous English cases upheld the power of common law courts to order a new trial if the judges deemed the punitive damages unreasonable. See, e.g., *Page 538 Gilbert v. Burtenshaw, 1 Cowper 230, 98 Eng. Rep. 1059 (K.B. 1774) (Mansfield, J.) (recognizing judicial power to grant new trial when jury awards of damages are excessive).[10]
 "American courts adopted the same procedure. In Whipple v. Cumberland Mfg. Co., 29 F. Cas. 934, 937-38 (C.C.Me. 1843), Justice Story, sitting as a Circuit Justice, acknowledged the judicial duty to set aside a jury verdict for unreasonable damages. He had previously stated the American doctrine as follows:
 " 'As to the question of excessive damages, I agree, that the court may grant a new trial for excessive damages. . . . It is indeed an exercise of discretion full of delicacy and difficulty. But if it should clearly appear that the jury have committed a gross error, or have acted from improper motives, or have given damages excessive in relation to the person or the injury, it is as much the duty of the court to interfere, to prevent the wrong, as in any other case.'
 "Blunt v. Little, 3 F.Cas. 760, 761-62 (C.C.Mass. 1822) (Story, J., sitting as Circuit Justice).
 "In National Surety Co. v. Mabry, 139 Ala. 217, 225, 35 So. 698, 701 (1903), this Court recognized the judicial duty to reduce unreasonable awards of punitive damages, by citing with approval Lord Mansfield's opinion in Gilbert, supra, and Justice Story's opinion in Whipple, supra. See, e.g., Cook Laurie Contracting Co. v. Bell, 177 Ala. 618, 635, 59 So. 273, 279 (1912) ('Remittiturs are favored by the courts in proper cases, for the promotion of justice and the ending of litigation') (quoting Richardson v. Birmingham Cotton Mfg. Co., 116 Ala. 381, 22 So. 478 (1897)); Airheart v. Green, 267 Ala. 689, 692-93, 104 So.2d 687 (1958) (affirming trial court's order of remittitur of damages).
 "In Hammond v. City of Gadsden, 493 So.2d 1374
(Ala. 1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala. 1989), this Court established standards for trial judges to apply in granting or denying new trial motions on the grounds of excessiveness of punitive damages and for appellate courts to use in reviewing the trial judges' actions.
"C
 "We recognized in Green Oil, 539 So.2d at 222-24, that the excessiveness review measures when the rebuttable presumption of correctness for jury awards of punitive damages wanes and is finally overcome. Accordingly, Green Oil provided both punitive factors and protective factors. The Green Oil punitive factors include: (1) removing the profit that the tortfeasor gained from his wrongful conduct; (2) providing a penalty that is sufficiently large to 'sting' the tortfeasor, given his financial position; and (3) considering the reasonable costs of litigation. Id. at 223. The Green Oil protective factors include: (1) ensuring a reasonable relationship between the size of the punitive damages award and the actual or likely harm resulting from the tortfeasor's wrongful conduct; (2) allowing only truly reprehensible conduct to justify sizable punitive damages awards; (3) ensuring that the punitive damages award does not devastate the tortfeasor, given his financial position; and (4) reducing the punitive damages award by any civil or criminal penalties imposed on the tortfeasor for the same conduct. Id. at 223-24. The difference between the Supreme Court's decision in this case and its decision in Haslip, supra, then, can be explained by looking to the rigor of this Court's application of the protective Green Oil factors.[11] This Court's less stringent application of these factors in [BMW I] put our state law in conflict with the Supreme Court's application of the three federal due process guideposts.[12]
". . . The State Law Solution
 "To resolve the present conflict between the state law reasonableness standard and the federal law excessiveness standard, I would return to the traditional, restrictive Alabama reasonableness standard. Although the Supreme Court, and thus, this *Page 539 
Court, cannot precisely define the 'outer limit' of federal due process, 517 U.S. at ___, 116 S.Ct. at 1602 ('[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula'), we can more precisely define the 'inner boundary' of state law reasonableness, Hammond, 493 So.2d at 1378 ('[T]he responsibility to adopt standards [for requiring remittitur] lies with this Court'). To the extent this definition comports with history by producing a common law reasonableness standard that is stricter than the federal law excessiveness standard, it would both avoid conflict with binding Supreme Court precedent and provide a more workable standard for Alabama courts to apply. Specifically, I would reinvigorate the following protective Green Oil factors:
 "Ratio of Punitive Damages to Compensatory Damages — Although the Supreme Court rejected any fixed ratio, it recognized that punitive damages 'must bear a "reasonable relationship" to compensatory damages.' 517 U.S. at ___ _ ___, 116 S.Ct. at 1601-02. I agree with the majority that this Court should not adopt a specific ratio as a judicially imposed cap on punitive damages. At the same time, I recognize that of the protective Green Oil factors, the ratio of punitive damages to compensatory damages provides the most practical guideline for Alabama trial judges.[13] Both the Alabama Legislature and Congress have established treble damages as the most common punitive standard.[14] I would therefore adopt that three-to-one ratio, not as any kind of rigid restraint, but to serve as a benchmark against which to measure reasonableness. Significant deviations above the three-to-one benchmark should require special justification.
 "Reprehensibility of the Conduct — The Supreme Court stated that the degree of reprehensibility of the defendant's conduct was '[p]erhaps the most important' guidepost for assessing whether a punitive damages award is excessive. 517 U.S. at ___, 116 S.Ct. at 1599. To justify a sizable punitive damages award, the Supreme Court requires evidence of 'indifference to or reckless disregard for the health and safety of others,' as opposed to mere economic harm. Id. For purely economic harm to justify a substantial award, it must be coupled with intentional, 'affirmative acts of misconduct, . . . financially vulnerable [victims,] . . . [or] prohibited conduct [engaged in] while knowing or suspecting that it was unlawful.' Id.
 "To justify a punitive damages award of greater than three times compensatory damages, I would define the Green Oil factor of reprehensibility to require: (1) endangerment of the physical health and safety of others; or (2) economic harm resulting from an intentional misrepresentation, deceit, or concealment of a material fact, as set out in Ala. Code 1975, § 6-11-20(b)(1), coupled with either (a) conduct repeated in spite of prior punishment, or (b) a substantial number of similar misrepresentations or acts of concealment.[15]
 "Similar Civil and Criminal Sanctions — The Supreme Court stated that in assessing the size of a punitive damages award, a court should 'accord substantial deference' to statutory fines or civil or criminal sanctions for comparable misconduct. 517 U.S. at ___, 116 S.Ct. at 1603. The Supreme Court also noted that a statutory fine could be multiplied by the number of wrongful acts for comparison to the punitive damages award. 517 U.S. at ___, 116 S.Ct. at 1603.
 "I would define the Green Oil factor of comparable civil and criminal sanctions to require comparison of the punitive damages award to civil or criminal penalties for similar misconduct, if such penalties exist.[16] To justify an award of greater than three times compensatory damages, the comparable civil or criminal penalties must involve substantial monetary fines or imprisonment.
 "The vigilant and consistent application of these Green Oil factors to the specific facts of each case would, I believe, eliminate the danger that Alabama punitive damages awards will transgress the 'outer *Page 540 
limit' imposed on those awards by federal due process requirements."
 APPLICATION OF THE ANALYSIS TO LIFE INSURANCE COMPANY OF GEORGIA v. JOHNSON
I would apply the strict state law reasonableness standard to this case as follows: First, because the trial judge placed sufficient facts and analysis in the record to permit appellate review of the reasonableness of the punitive damages award, remand is not necessary.[12] Second, I would apply an exacting review to each of the Green Oil factors, including the reinvigorated protective factors. In this case, the defendant Life of Georgia sold Daisey Johnson, a poor and elderly woman, a Medicare supplement policy that, because she was already eligible for Medicaid, provided her no net benefits. Johnson I, 684 So.2d at 687. Johnson introduced evidence that tended to show that Life Insurance Company of Georgia ("Life of *Page 541 
Georgia") knew she was on Medicaid but purposely misrepresented that she needed the Medicare supplement policy to pay her hospital bills if she became ill. Id. at 688. Johnson purchased the supplement policy and made premium payments for almost three years. Id. After learning that the policy was worthless to her, she brought fraud and suppression claims against Life of Georgia. Id. at 687.
1. Ratio of Punitive Damages to Compensatory Damages — In this case, the jury awarded $15,000,000 in punitive damages and $250,000 in compensatory damages. Id. at 687. This far exceeds the three-to-one benchmark. Accordingly, the record must demonstrate clear and specific justification.
2. Reprehensibility — Although Life of Georgia's actions did not endanger the physical health or safety of Johnson or others, its conduct reflects infliction of economic and emotional harm on a vulnerable victim, resulting from an affirmative misrepresentation, coupled with repeated conduct after a prior punishment. Id. at 688-90. See Johnson I, 684 So.2d at 689 (noting that after suffering an adverse verdict in 1992 for selling Medicare supplement policies to unqualified persons, Life of Georgia continued its fraudulent practices through June 1994); Foster v. Life Ins. Co. of Georgia,656 So.2d 333 (Ala. 1994) (approving a $1,000,000 punitive award for the same course of conduct). Daisey Johnson was an 87-year-old uneducated, black woman without a husband. She spent almost a third of her fixed income over a three-year period to pay for a worthless policy. Johnson I, 684 So.2d at 688-89. The trial court found that Life of Georgia marketed such worthless policies to other similarly vulnerable victims. Id. at 689. Thus, a ratio of greater than 3:1 punitive damages to actual harm is appropriate. I consider as compelling, among other facts, the vulnerability of the poor and elderly victims, the major financial concern that health insurance poses for them and Life of Georgia's continued sale of the worthless policies to these vulnerable victims even after receiving an adverse verdict in another case for similar wrongdoing. Id. at 689-90. In light of the particular egregious facts of this case, I would hold that Life of Georgia's conduct was reprehensible enough to justify a punitive award of up to five times the compensatory damages, or $1,250,000.
3. Similar Civil and Criminal Sanctions — Ala. Code 1975, §27-1-12, imposes a $1,000 fine, up to one year of imprisonment, or both, for each willful violation of the Alabama Insurance Code. Because the record does not reflect a multitude of violations by Life of Georgia, the possible criminal fine would probably be well below $1,250,000. Therefore, this factor supports the reduction of the punitive award below a five-to-one ratio.[13]
4. Profitability of Conduct — Johnson paid a total of $3,132 in premiums to Life of Georgia with respect to the Medicare supplement policy. Johnson I, 684 So.2d at 688. A punitive damages award of $1,000,000 to $1,250,000 would more than remove the profit earned by Life of Georgia on the $3,132 it received from Johnson. See Green Oil, 539 So.2d at 223.
5. Financial Position of the Defendant — Life of Georgia's financial reports indicate that in 1993 it earned over $173 million in investment income. Johnson I, 684 So.2d at 691. With this level of investment income, a punitive award of $1,250,000 would sufficiently punish the company without financially devastating it. See Green Oil, 539 So.2d at 223.
6. Costs of Litigation — The plaintiff's attorneys tried the case to a jury and did a thorough job of handling the direct appeal and application for rehearing in this Court. *Page 542 Johnson I, 684 So.2d 685 passim. There was no evidence of abuse of the legal process. Given the particular facts of this case, a punitive damages award of $1,250,000 should be ample.[14] SeeGreen Oil, 539 So.2d at 223.
I conclude that a punitive damages award of $1,250,000 would be reasonable in this case.[15] I would, therefore, affirm the judgment of the trial court, conditioned on the plaintiff's filing a remittitur of all punitive damages in excess of that amount.
HOOPER, C.J., and MADDOX, J., concur.
[7] Compare, e.g., I William Blackstone, Commentaries *46 (describing the Roman emperor Caligula's unjust practice of writing his laws in small characters and hanging them on high pillars, thereby facilitating arbitrary enforcement) with J.B. Bury, A History of Greece 179 (Modern Lib. ed. 1937) (describing the Greek lawgiver Solon's just practice of inscribing his laws on wooden tables and placing them on revolving stands in the Public Hall of Athens, thereby facilitating consistent enforcement).
[8] As Justice Holmes stated:
 "People want to know under what circumstances and how far they will run the risk of coming against what is so much stronger than themselves [i.e., public enforcement of judicial decrees], and hence it becomes a business to find out when this danger is to be feared. The object of our study, then, is prediction, the prediction of the incidence of public force through the instrumentality of the courts."
Oliver Wendell Holmes, Jr., The Path of the Law, in Collected Legal Papers 167, 167 (Legal Classics Lib. ed. 1982).
[9] A majority of this Court has also rejected the Legislature's attempt to provide predictability. Compare Henderson v. AlabamaPower Co., 627 So.2d 878 (Ala. 1993) (holding that a statute limiting punitive awards violated the Alabama Constitution) with BMW of North America, Inc. v. Gore, 517 U.S. 559, ___ _ ___, 116 S.Ct. 1589, 1608-09, 134 L.Ed.2d 809 (1996) (Breyer, J., concurring) (citing favorably Texas, Connecticut, Florida, and Georgia statutes that limit punitive damages awards).
[10] Indeed, the majority's application of the Supreme Court's three-factor constraint on punitive damages would permit avoidance of the Supreme Court's limit on punitive damages through the filing of numerous separate actions against a defendant in the place of the filing of a single class action. The majority indicates that a $3 million punitive award is justified to some degree on the basis of the defendant's harm to other insureds. Yet, the majority refuses to tie the punitive award to any particular ratio of punitive to compensatory damages. See generally Bruce J. McKee, TheImplications of BMW v. Gore for Future Punitive DamagesLitigation: Observations from a Participant, 48 Ala.L.Rev. 175 (Fall 1996) (noting that if punitive damages are tied to a given ratio of compensatory damages, then plaintiffs' lawyers will file class actions to facilitate efficient litigation in light of an aggregate limit on damages); id. at n. 371 (stating that a motion for class action certification in a case similar to BMW I had been filed as of October 12, 1996). Thus, while ostensibly approving the imposition of a $3 million punishment on Life of Georgia, the majority, in light of Foster v. LifeIns. Co. of Georgia, 656 So.2d 333 (Ala. 1994) (approving $1 million punitive award for the same course of conduct as that punished in this case), has in fact approved at least a $4 million punishment. The majority's application invites still other punitive awards that do not, in and of themselves, violate the "outer limit" of federal due process. With 116,000 potential plaintiffs, Life of Georgia could well be exposed to an aggregate punitive liability of many multiples of the $3 million punitive award approved in this case.
[11] The way the majority applies the constitutional standard introduces into that standard the same defect that ultimately rendered the Green Oil factors ineffective and produced the verdict in BMW. See BMW, 517 U.S. at ___ _ ___,116 S.Ct. at 1606-07 (Breyer, J., concurring) ("Alabama courts . . . have applied the 'factors' intended to constrain punitive damages awards . . . in a way that belies that purpose.").
 "10 See also Jones v. Sparrow, 5 T.R. 257, 101 Eng. Rep. 144 (K.B. 1793) (new trial granted for excessive damages); Hewlett v. Cruchley, 5 Taunt. 277, 281, 128 Eng. Rep. 696, 698 (C.P. 1813) ('[I]t is now well acknowledged in all the Courts of Westminster-hall, that whether in actions for criminal conversation, malicious prosecutions, words, or any other matter, if the damages are clearly too large, the Courts will send the inquiry to another jury.') (emphasis in original).
 "11 In his opinion in [Gore], 517 U.S. at ___, 116 S.Ct. at 1606, Justice Breyer, speaking for three members of the five-member majority, criticized this Court's application of the Green Oil factors.
 "12 I note that the three due process guideposts (i.e., reprehensibility of the wrongful conduct, ratio of punitive damages to compensatory damages, and comparable civil and criminal penalties) are similar to the three protective Green Oil factors (i.e., reprehensibility of the wrongful conduct, reasonable relationship of the size of the punitive award to the actual and probable harm, and mitigation for actual civil and criminal penalties imposed). This is because the guideposts and the protective Green Oil factors protect similar interests. The three guideposts protect the defendant's due process right to receive fair notice of the severity of potential penalties against him, 517 U.S. at ___, 116 S.Ct. at 1598, and the three Green Oil factors protect the defendant from unreasonable punitive awards imposed by an impassioned or prejudiced jury, Green Oil, 539 So.2d at 222.
 "13 The principle that punitive damages should bear a reasonable relationship to compensatory damages has roots going back to the early English statutes that provided for punitive damages equal to a multiple of actual damages. See David G. Owen, A Punitive Damages Overview: Functions, Problems and Reform, 39 Vill.L.Rev. 363, 368 n. 23 (1994). Alabama courts have consistently upheld the reasonable relationship principle. See Mobile Montgomery R.R. v. Ashcraft, 48 Ala. 15, 33 (1872) ('punitive damages ought . . . to bear proportion to the actual damages sustained'). (Emphasis added.) Such authorities plainly suggest that a reasonable ratio between punitive damages and actual damages is a hallmark of common law reasonableness.
 "14 Ala. Code 1975, § 8-19-10(a)(2) (providing for treble damages for certain violations of the Deceptive Trade Practices Act); § 37-2-18 (providing treble damages for certain harm caused by common carriers); § 10-2B-15.02
(levying a penalty 'equal to treble the amount of all fees and taxes' on foreign corporations that fail to obtain a certificate of authority); 18 U.S.C. § 1964(c) (providing for treble damages for civil violations of the Racketeer Influenced and Corrupt Organizations Act); 15 U.S.C. § 15
(providing for treble damages for violations of the Sherman Act's prohibition on monopolistic practices).
". . . .
 "15 I would require further indicia of egregious conduct to justify a sizable punitive award when physical safety or health is not endangered. In Green Oil, 539 So.2d at 223, this Court stated:
 " 'The degree of reprehensibility of the defendant's conduct should be considered. The duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or 'cover-up' of that hazard, and the existence and frequency of similar past conduct should all be relevant in determining this degree of reprehensibility.'
"16 In Green Oil, 539 So.2d at 223-24, this Court stated:
 " 'If criminal sanctions have been imposed on the defendant for his conduct, this should be taken into account in mitigation of the punitive damages award.
" '. . . .
 " '. . . If there have been other civil actions against the same defendant, based on the same conduct, this should be taken into account in mitigation of the punitive damages award.'
 "(Quoting Aetna [Life Ins. Co. v. Lavoie], 505 So.2d [1050,] 1062 [(Ala. 1987)].)"
[12] In Hammond, 493 So.2d at 1379, this Court required "trial courts to reflect in the record the reasons for interfering with a jury verdict, or refusing to do so, on grounds of excessiveness of the damages." I reiterate the necessity for trial courts to examine with specificity each of the Green Oil
factors in light of the evidence at trial and to reflect in the record how the final punitive award was determined.
[13] Because the 5:1 ratio I would adopt in this case would serve to limit aggregate punitive damages, a reduction for the $1,000,000 civil sanction in Foster v. Life Ins. Co. ofGeorgia, 656 So.2d 333 (Ala. 1994), is not required. Of course, special circumstances could require a further reduction. The majority, however, sets no limit on the overall aggregate award against Life of Georgia. Instead, the majority merely states that the $1,000,000 award in Foster is "to be taken in mitigation," without detailing how the mitigation impacts the aggregate punitive award against Life of Georgia. 701 So.2d at 534.
[14] In certain cases involving small amounts of actual damages, it may be necessary to give relatively more weight to costs of litigation, in order to ease the burden of plaintiffs with special financial needs. Properly constrained, this principle should not promote unreasonable punitive awards. See BMW, 517 U.S. at ___, 116 S.Ct. at 1607 (Breyer, J., concurring); see also Continental Trend Resources, Inc. v. OXY USA Inc.,101 F.3d 634, 642 (10th Cir. 1996), cert. denied, ___ U.S. ___,117 S.Ct. 1846, 137 L.Ed.2d 1049 (1997) (stating that considering litigation costs in setting punitive damages awards may tend to prevent a "rich defendant" from forcing or prolonging litigation where the plaintiff cannot bear the costs of the delay).
[15] See generally, e.g., North Carolina Mut. Life Ins. Co. v.Holley, 533 So.2d 497 (Ala. 1987) (requiring remittitur to $500,000 from a $1,000,000 punitive award where insurance company knowingly sold policy to cancer victim who did not qualify for coverage, and, upon her death, refused payment);National States Ins. Co. v. Jones, 393 So.2d 1361 (Ala. 1980) (upholding remittitur to $500,000 from a $3,500,000 punitive award where insurance company fraudulently induced a woman to purchase various health policies and then canceled coverage based on allegedly incorrect application); see also Haslip,499 U.S. at 2, 7 n. 2, 23, 111 S.Ct. at 1035-36, 1037 n. 2, 1046 (stating that an $840,000 punitive award for fraud in misappropriating premiums paid for health insurance was "close to the line" of constitutional excessiveness); Lee v. Edwards,101 F.3d 805 (2d Cir. 1996) (applying BMW guideposts to require remittitur to $75,000 from a $200,000 punitive award against police officer for malicious prosecution of a drunken driver for assault and resisting arrest).
Alabama trial court data compiled by the Administrative Office of Courts for the 1993, 1994, and 1995 fiscal years (the 1994 data include this case) show:
FY '93 FY '94 FY '95
Total punitive damages awards $22,056,530 $140,452,942 $80,132,880
Total compensatory awards in cases in which punitive damages were awarded 18,591,232 14,430,227 16,548,514
Range of punitive 1,000 to 1 to 1,500 to awards 5,000,000 50,000,000 12,000,000
Median award 35,000 40,000 50,000
Ratio of punitive awards to compensatory awards 1.2:1 9.7:1 4.8:1
Caseload Statistics on the Disposition of Civil Cases inAlabama (Administrative Office of Courts, Fiscal Year 1993); id. (Fiscal Year 1994); id. (Fiscal Year 1995). *Page 821