58 F.3d 1523
 FEDERAL DEPOSIT INSURANCE CORPORATION, acting in its
corporate capacity, Plaintiff,
v.
Sandra B. HAMILTON, an individual; L.G. Hamilton, an
individual, Defendants-Appellees,
v.
NCNB TEXAS NATIONAL BANK, and Nations Bank,
Third-Party-Defendant-Appellant.
 No. 94-6096.
 United States Court of Appeals,
Tenth Circuit.
 July 7, 1995.
 
 Conner L. Helms (Drew Neville, Russell A. Cook, and Brinda K. White of Linn & Neville, P.C. with him on the briefs), of Woska, Hasbrook, Dowd, Underwood & Helms, Oklahoma City, OK, for appellees.
 Kirk D. Fredrickson (Douglas N. Gould with him on the briefs), of Hall, Estill, Hardwick, Gable, Golden & Nelson, Oklahoma City, OK, for appellant.
 Before ANDERSON, BARRETT and BALDOCK, Circuit Judges.
 BARRETT, Senior Circuit Judge.
 
 
 1
 NationsBank of Texas, N.A. (NationsBank), formerly NCNB Texas National Bank, third party defendant, appeals from the judgment of the district court in favor of Sandra B. Hamilton and, her son, L.G. Brown Hamilton, collectively referred to as "the Hamiltons."[1]Facts
 
 
 2
 On October 12, 1990, the Hamiltons entered into a Real Estate Lease Purchase Contract (the Agreement) with NationsBank regarding an 11,584 square foot residential property located at 1512 West Plato Road, Duncan, Oklahoma (the Property). The Agreement provided for a three year lease term with an option to purchase at any time during the lease term.
 
 
 3
 The Agreement obligated the Hamiltons to pay $1,400 monthly in rent, additional amounts for insurance and property taxes, and to repair the swimming pool during the first year of the lease term. NationsBank was to reimburse one-half of the pool repair expenses if the purchase option was not exercised. Under the Agreement, NationsBank was responsible for "maintenance and repair of all functions of the property to the extent such repairs and maintenance exceed $1,000 per year." (Appellant's Appendix, Vol. I at 6).
 
 
 4
 The Agreement allowed the Hamiltons, at their own expense, to construct a recording studio in the garage area of the Property and provided that in the event the Hamiltons did not purchase the Property the cost of reconverting the studio back into a garage would be offset against the obligation to reimburse one-half of the pool repair expenses. The Hamiltons intended to operate a recording studio with overnight accommodations for studio guests.
 
 
 5
 In November, 1990, NationsBank's asset manager, Tom Grimland (Grimland), toured the Property with the Hamiltons and identified certain items which the Hamiltons asked to be repaired. Grimland agreed on behalf of NationsBank to make certain of these repairs. The repair work was assigned to Harvey Garrett, the original builder of the home.
 
 
 6
 In January, 1991, Ward Warren (Warren) replaced Grimland as asset manager for the Property. Warren learned that the Hamiltons were having difficulty with Garrett. Warren toured the Property with the Hamiltons and they presented him with a list of items in need of repair or replacement. Warren discussed the list with Grimland and concluded that due to the extent of the needed repairs it would be appropriate to engage a construction consultant to oversee the project.
 
 
 7
 In March, 1991, George Gibson (Gibson) was hired by NationsBank as a construction consultant to identify the deficiencies at the Property and to secure repair bids. Gibson toured the Property on March 29, 1991, with the Hamiltons and prepared a schedule of proposed repairs. Len Lawson (Lawson) was selected, by the Hamiltons, as the contractor to perform the repairs and was asked to provide a cost estimate for each item.
 
 
 8
 In April, 1991, NationsBank unilaterally advised the Hamiltons that rental payments could be deferred in order to allow the parties to determine what amount of repair expenses incurred by the Hamiltons should be credited against their lease obligation. At this time, the Hamiltons provided Gibson with a list of additional repair items, largely consisting of electrical repairs. This list was incorporated by Gibson into a seven-page document entitled Expenditure Summary and Reconciliation (the Repair Summary).
 
 
 9
 In late April, 1991, Gibson revised the Repair Summary to include the cost estimates obtained from Lawson and to reflect his personal recommendations as to the allocation of financial responsibility for various repair items. At this time, the aggregate cost of the repairs was $37,955.51.
 
 
 10
 In early May, 1991, Warren asked the Hamiltons to prioritize the repairs so that the most important items could be completed first. Warren then met with his supervisors and the decision was made to immediately repair the most critical items, to address the remaining items later in conjunction with negotiation for a more definite lease agreement, and to discuss the distinction between functional and cosmetic repair.
 
 
 11
 On June 13, 1991, Warren notified the Hamiltons of these decisions, stating that: (1) many of the items fall into the category of capital improvements and repairs which are beyond the scope of the typical landlord/tenant relationship; and (2) a portion of the items would be performed immediately as a gesture of good faith while the balance would be addressed as part of the discussions in connection with finalizing the Agreement.
 
 
 12
 NationsBank then entered into two construction contracts addressing the major repair items. The contract work was completed by mid-July, 1991, at a total cost of $20,022.43. (Appendix Vol. I at 107).
 
 
 13
 In July, 1991, following completion of the repair contracts, Warren and his supervisor, David Wells (Wells), met with the Hamiltons. Wells allegedly told the Hamiltons that NationsBank "wanted out of the deal" and suggested the parties discuss sale of the Property to the Hamiltons, as well as having the Hamiltons take responsibility for the remaining repairs with a corresponding reduction in the purchase price by the amount of the repairs remaining unperformed.
 
 
 14
 The Hamiltons notified NationsBank on August 8, 1991, that they would submit a purchase offer as soon as they received the cost of repair estimates from Lawson. No purchase offer was submitted.
 
 
 15
 On October 2, 1991, NationsBank sent the Hamiltons a proposed draft of a more definitive lease agreement with an explanatory letter urging them to respond so that the balance of the repair items could be addressed. The letter stated, "We realize that there are additional repairs which need to be completed, however, we will only complete the repairs after the contract has been finalized and executed by you."
 
 
 16
 On November 6, 1991, the Hamiltons notified NationsBank that the new lease proposal was unacceptable, claiming that NationsBank was trying to change its responsibilities. The Hamiltons continued to occupy the Property and expend funds modifying and decorating the Property. The Hamiltons claimed that the amount of needed repairs had increased to $215,000 and that they had expended $40,010 for repairs which were the responsibility of NationsBank. The Hamiltons requested a rent abatement due to the uninhabitable conditions and claimed they had lost income due to the condition of the residence. Discussions ensued on the possibility of trading the Property for property Sandra Hamilton owned in Oklahoma City.
 
 
 17
 On November 30, 1991, NationsBank assigned its interest in the Property and related lease/purchase agreements to the Federal Deposit Insurance Corporation (FDIC) pursuant to an assistance agreement accompanying NationsBank's purchase of the assets of the failed First Republic Bank of Texas. NationsBank remained the Property manager.
 
 
 18
 Settlement negotiations ensued and on February 25, 1992, Warren communicated the FDIC's counteroffer of $270,000. Warren also explained that the remaining repairs in the Repair Summary would be completed at a cost of approximately $12,000, which would be deducted from the FDIC offer.
 
 
 19
 On March 18, 1992, the Hamiltons countered with a $160,000 offer claiming that the Property was still in need of extensive repairs which were the landlord's responsibility.
 
 
 20
 On May 12, 1992, the FDIC offered to sell the Property for $229,000 and waive all back rental claims. The fair market value of the Property according to a May, 1991, appraisal was $350,000.
 
 
 21
 Also, on May 12, 1992, the FDIC filed suit against the Hamiltons in the district court seeking a declaratory judgment that the Agreement be terminated, that FDIC was entitled to immediate possession of the Property, and for eviction and monetary recovery for breach of the Agreement based on the following contentions: (1) failure to pay rent and other lease obligations after demand; (2) failure to complete repair of the swimming pool during the first year of the lease term or thereafter; and (3) failure to enter into a more definitive lease purchase agreement, or even to reasonably negotiate such an agreement. The Hamiltons asserted that, at this time, most of the repairs in the Repair Summary had not been completed and that additional items were in need of repair.
 
 
 22
 On June 24, 1992, the Hamiltons filed counterclaims against the FDIC and NationsBank claiming breach of contract and fraud in the inducement of the contract. The third party claims against NationsBank were amended to include the allegation that NationsBank intentionally concealed its true intentions regarding repairs to induce the Hamiltons to remain on the Property and to continue to invest substantial amounts of money (the fraud claim).
 
 
 23
 On April 15, 1993, the court denied cross-motions for summary judgment and the case proceeded to trial to the court. At a hearing on September 17, 1993, the court announced the general structure of its ruling that: the Oklahoma Residential Landlord and Tenant Act (ORLTA) applies divisibly to the residential portions of the Property only; the ORLTA does not immunize a defrauding lessor from the normal common law consequence of its fraud; no fraud occurred with the original lease agreement or from Grimland's conduct; fraud was committed by Warren with respect to his repeated promises to repair; and the Hamiltons were not in breach of the lease agreement.
 
 
 24
 On the issue of damages, the court stated that: rent due would be abated by undone repairs; reimbursement for repairs made to the business portion of the premises would be fully recoverable; reimbursement for repairs to the residential portion would be subject to the ORLTA cap; and fraud damages would include only expenses incurred between March/April 1991 and October 2, 1992.
 
 
 25
 On November 17, 1993, at a supplemental hearing on the issue of damages, the court awarded the Hamiltons $1,200,000 in punitive damages based on their fraud claim. On November 18, 1993, after receiving additional evidence on the issue of actual damages, the court awarded actual damages to the Hamiltons as follows: no recovery for lost profits; rent abatement in the amount of $5,300; $19,720 from the FDIC for repairs made to the commercial portion of the premises which were the landlord's responsibility on its breach of contract claim; $1,537.48 from the FDIC for repairs made which were the landlord's responsibility under the ORLTA; no damages for flood damage; $44,000 from NationsBank for damages caused by NationsBank's and Warren's fraudulent conduct; and recovery of their $1,400 security deposit from the FDIC. The court awarded the FDIC $56,606.64 for rent, insurance, and tax obligations under the Agreement. The court denied the FDIC's request for immediate possession, finding that the Hamiltons had not breached the Agreement.
 
 
 26
 On February 10, 1994, the court entered its final Journal Entry of Judgment.
 
 Issues
 
 27
 NationsBank contends that: (1) the ORLTA provided the exclusive remedy in this case; (2) no actionable fraud existed under the evidence of the case; (3) under Oklahoma law punitive damages do not lie in an action arising from a contract; and (4) the punitive damages award violated state and federal law.[2]
 
 Discussion
 I.
 
 28
 NationsBank contends that the district court erred in concluding that the ORLTA only partially applied to the Hamiltons' counterclaims because the ORLTA provided the exclusive remedy in this case. NationsBank asserts that the ORLTA preclusively governs the rights and remedies of the parties to a lease of a residential dwelling unit in Oklahoma and that any claims from an alleged failure to make repairs to the Property are governed exclusively by the ORLTA; thus, a tenant may not bring a claim for punitive damages in excess of those provided thereby.
 
 
 29
 The district court determined that the ORLTA applied divisibly only to the residential portions of the Property and that the ORLTA did not preclude the Hamiltons from asserting common law fraud claims. We review de novo a district court's determination of state law. Salve Regina College v. Russell, 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991); Mares v. ConAgra Poultry Co., Inc, 971 F.2d 492, 495 (10th Cir.1992).
 
 
 30
 The ORLTA "applies to, regulates, and determines rights, obligations and remedies under a rental agreement, wherever made, for a dwelling unit located within this state." Okla. Stat. tit. 41 Sec. 103. A "dwelling unit" is defined as "a structure, or that part of a structure, which is used as a home, residence or sleeping place by one or more persons." Okla. Stat. tit. 41 Sec. 102(3). Thus, by the plain language of the statute, the ORLTA applies divisibly to that part of a structure which is used as a residence.
 
 
 31
 The Oklahoma Supreme Court has construed the ORLTA to be the exclusive remedy available to a residential tenant for a landlord's breach of any and all obligations delineated within the act or rental agreement covered by the act. Wagoner v. Bennett, 814 P.2d 476, 479-80 (Okla.1991). "[W]here a statute creates a right and prescribes a remedy for its violation, the remedy thus prescribed is exclusive." Ewing v. Cadwell, 121 Okla. 115, 247 P. 665, 666 (1925). However, by statutory mandate, the common law remains in full force and effect unless a statute explicitly provides to the contrary. Okla. Stat. tit. 12 Sec. 2; Tate v. Browning-Ferris, Inc., 833 P.2d 1218, 1225 (Okla.1992). The Oklahoma courts recognize that instances in which a common law remedy continues side by side with a statute that evinces no legislative intent to supplant the common law are not uncommon in Oklahoma jurisprudence. Id. at 1226 n. 36. This is our case.
 
 
 32
 While the ORLTA is the exclusive remedy for those delineated rights and obligations found in its passages, it does not affect those common law rights, obligations, and remedies not found within its passages. In Wagoner, the court held that since Sec. 123 of the ORLTA fixes the remedy for one's wrongful removal or exclusion from a dwelling unit, Sec. 123 supplanted the tenant's common law action for wrongful eviction. 814 P.2d at 480. However, the court noted that this does not exclude the possibility of a traditional common law cause of action for conversion and/or injury to personal property. Id. at 481. The court held that because the ORLTA did not address this latter common law claim the ORLTA does not supplant it and a tenant may bring a common law action for conversion. Id. Since punitive damages are permissible in a common law conversion action, the court held that an award of punitive damages is not governed by the statutory limits set for a wrongful eviction action; they are two different wrongs with correspondingly different remedies. Nowhere does the ORLTA mention a cause of action for fraud. Hence, the ORLTA does not supplant the Hamiltons' common law fraud claims and its remedies.
 
 
 33
 Accordingly, we hold that the district court did not err in determining that the ORLTA applied to the residential portions of the Property and not to the business portions, that the ORLTA did not apply to the Hamiltons' common law fraud claims and, thus, did not limits the remedies available on those claims.
 
 II.
 A.
 
 34
 NationsBank contends that under the evidence in the record, Oklahoma law does not permit any recovery for fraud in this case. In support of its contention, NationsBank asserts five points of error: (1) that uncontroverted evidence of acts in furtherance of performance of the promises to repair precludes a finding of fraud; (2) no evidence reasonably supports a finding that false promises to perform repairs were intended to induce assent by the Hamiltons or create a benefit to NationsBank; (3) there was no showing of detrimental reliance; (4) the Hamiltons had no expectation of completed performance; and (5) there was no evidence of concealment of NationsBank's true intentions regarding performance of repairs. Due to the dispositive nature of issue (1), we will not address issues (2) through (5).
 
 B.
 
 35
 NationsBank asserts that uncontroverted evidence of acts in furtherance of performance of its promises to repair precludes any finding of fraud on the theory of promises made with no intention to perform.
 
 
 36
 Although the general rule is that to be actionable fraud the false representations must be of existing facts, under Oklahoma law fraud may be predicated upon a promise to do a thing in the future when the promisor's intent is otherwise. Wagstaff v. Protective Apparel Corp. of America, Inc., 760 F.2d 1074, 1077 (10th Cir.1985); Tice v. Tice, 672 P.2d 1168, 1171 (Okla.1983). "The gist of the rule is not the breach of promise but the fraudulent intent of the promisor at the time the pledge is made not to perform the promise so made and thereby deceive the promisee." Citation Co. Realtors, Inc. v. Lyon, 610 P.2d 788, 790 (Okla.1980). The court stated that "[t]here is a wide distinction between the nonperformance of a promise and a promise made mala fide, only the latter being actionable fraud." Id.
 
 
 37
 In Citation, a buyer asserted fraud in the performance of a realtor's contract claiming that the realtor acted fraudulently by misrepresenting the broker's intent to market the property. 610 P.2d at 789-90. In upholding the trial court's grant of summary judgment disallowing the fraud claim, the Oklahoma Supreme Court held that "the simple fact that the depositions illustrate attempts were made to sell the units removes the issue from the concept of fraud through a promise to execute a future act made mala fide and relegates the failure to perform to simple nonperformance of a promise." Id. at 791.
 
 
 38
 In a more recent case, Furr v. Thomas, 817 P.2d 1268, 1269 (Okla.1991), residential purchasers in a development asserted fraud in the performance of a sales contract, claiming that the seller acted fraudulently in promising to construct a two mile, all weather, smooth surface, road to serve the development without the intention of performing on the contract. The seller built a gravel road, which he maintained until the suit was filed, but he did not construct the promised black-top road. Id. The seller argued that the fraud claim should never have been submitted to the jury because when the fraud rests on a theory of making a promise with no intention of performing on the promise, any performance by the promisor precludes a finding of fraud. Id. at 1272. The seller contended that his construction and maintenance of the gravel road was sufficient. Id. The Oklahoma Supreme Court disagreed, stating that "just any action by the promisor will not suffice to avoid a claim for fraud." The court held that "the action of the promisor must be toward the fulfillment of the promise." Id. The court relied on the seller's admission that he did not build the road required by the sales contracts and that before he finished selling the lots, he had decided not to build it as specified in the contracts. Id.
 
 
 39
 Here, the district court found that NationsBank committed fraud through its agent, Warren, by knowingly making materially false representations regarding repairs between March and October, 1991. However, the record reflects that NationsBank spent in excess of $20,000 on repairs to the Property during the period in which the district court found fraudulent conduct.[3]
 
 
 40
 Unfortunately, we cannot discern from the record whether the district court considered the effect, if any, of the $20,000 in expenditures on the Hamiltons' fraud claim under the law of Oklahoma as stated in Citations and Furr, even though the issue as to whether the Hamiltons are entitled to recover on their fraud claim was clearly presented. See (Appellant's Appendix, Vol. I, p. 31 & 33). In NationsBank's closing argument to the court, specific reliance was made on Citation and Furr in conjunction with counsel's assertion that:
 
 
 41
 Now, in this case, Your Honor, we simply have many, many, many acts in fulfillment, and toward fulfillment of the original promise to repair and maintain the functions of the property. And under Oklahoma law, this is simply not a case that should even be considered by the Court to involve any fraud claim based on the theory that's espoused here.
 
 
 42
 (Appellant's Appendix, Vol. III, p. 656-57).
 
 
 43
 Under these circumstances, we must reverse the district court's finding of fraud and the awards of $44,000 in actual damages and $1,200,000 in punitive damages based on the fraud claim, and remand for further proceeding consistent with this opinion.
 
 III.
 
 44
 NationsBank contends that Oklahoma law prohibits punitive damages in actions such as this which arise out of a contract. We review the district court's ruling on issues of state law de novo. Salve Regina College, 499 U.S. 225, 111 S.Ct. 1217; ConAgra Poultry Co., 971 F.2d at 495.
 
 
 45
 Generally, Oklahoma law prohibits the award of punitive damages in a contract action. Okla. Stat. tit. 23, Sec. 9(A). However, the Oklahoma courts have allowed punitive damages where the parties' relationship is basically contractual, if the breaching party's acts constitute "an independent, willful tort." Zenith Drilling Corp. v. Internorth, Inc., 869 F.2d 560, 565 (10th Cir.1989) (citing Z.D. Howard Co. v. Cartwright, 537 P.2d 345, 347 (Okla.1975)). Under Oklahoma law, the plaintiff must recover damages for a tort before recovering punitive damages; a breach of contract alone cannot support an award of punitive damages. Norman's Heritage Real Estate Co. v. Aetna Casualty & Sur. Co., 727 F.2d 911, 916 (10th Cir.1984). See also Wagstaff, 760 F.2d at 1078 (under Oklahoma law, the plaintiff can recover punitive damages upon a showing of nominal damages from defendant's fraud).
 
 
 46
 Although the Hamiltons' relationship with NationsBank arose out of a contract and their counterclaims included claims for breach of contract, on which they prevailed, they may recover punitive damages only in the event that, on remand, the district court again finds that NationsBank committed the independent willful tort of fraud in light of Citation and Furr.
 
 Conclusion
 
 47
 We AFFIRM the district court's February 10, 1994, Journal Entry of Judgment with respect to the following awards/findings in favor of the Hamiltons and the FDIC, which were not challenged on appeal: no recovery for lost profits; $19,720 from the FDIC for repairs made to the commercial portion of the premises that were the landlord's responsibility on the breach of contract claim; $1,537.48 from the FDIC for repairs made which were the landlord's responsibility under the ORLTA; no recovery for flood damages; recovery of the $1,400 security deposit from FDIC; and $56,606.64 to the FDIC for rent, insurance and tax obligations under the Agreement.
 
 
 48
 We AFFIRM the district court's conclusion that the ORLTA applied divisibly to the residential portions of the Property and not to the business portions.
 
 
 49
 We REVERSE the district court's award of $44,000 in actual damages and $1,200,000 in punitive damages based on the fraud claim and REMAND for further proceedings consistent with this opinion.
 
 
 50
 AFFIRMED IN PART, REVERSED IN PART, and REMANDED.
 
 
 
 [1]
 NationsBank assigned its interest in the Property in question to the FDIC in November, 1991, and the FDIC initiated this action in May, 1992. See Facts, infra. The FDIC did not appeal the decisions of the district court that affected it and is, therefore, not involved in this appeal
 
 
 [2]
 Due to the dispositive nature of issues (1) and (2), we will consider issue (3) only in so far as it applies to the interpretation of Oklahoma law. We will not consider issue (4)
 
 
 [3]
 During oral argument counsel for the Hamiltons (appellees) stated eight times that "NationsBank never made a repair" during the March, 1991, to October, 1991, "window of fraud." At least two of these representations were in direct response to questions regarding the $20,000 of repairs made by NationsBank. (Appendix Vol. I at 107). The record does not support counsel's contentions and, in fact, supports the exact opposite conclusion, i.e., that repairs (at least $20,022.43 out of $37,955.51) were made before October, 1991. See (Appendix Vol. I at 102, 107; Vol. II at 348-49, 385-86, 401-10; Vol. III at 483-89)