**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 28 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

FEDERAL DEPOSIT INSURANCE
CORPORATION, acting in its corporate
capacity,

      Plaintiff,

v.

SANDRA B. HAMILTON and L.G.
HAMILTON, individuals,

      Defendants-Appellees,

v.

NCNB TEXAS NATIONAL BANK, and
NationsBank, Successor in Interest to
NCNB Texas National Bank,

      Defendant-Third Party Defendant-
Appellant.

No. 96-6104

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CIV-92-843-A)

---

Drew Neville of Linn & Neville, P.C., (Russell A. Cook and Brinda K. White of Linn &
Neville, P.C., and Connor L. Helms of Woska, Hasbrook, Dowd, Underwood & Helms,
with him on the brief), Oklahoma City, Oklahoma, for Defendants-Appellees.

Kirk D. Fredrickson of Bright & Barnes, P.C., (Douglas N. Gould of Thomas, Gould &
Nix, with him on the brief), Oklahoma City, Oklahoma, for Defendant-Third Party
Defendant-Appellant.

Before ANDERSON, BALDOCK, and EBEL, Circuit Judges.

_____

BALDOCK, Circuit Judge, delivering the Opinion of the Court as to Parts I and II, in which ANDERSON, Circuit Judge, concurs, and as to Part III, in which ANDERSON and EBEL, Circuit Judges, concur.

EBEL, Circuit Judge, delivering the Opinion of the Court as to Part IV, in which ANDERSON, Circuit Judge, concurs.

This case is before us a second time. In Federal Deposit Insurance Corp. v. Hamilton, 58 F.3d 1523 (10th Cir. 1995), we, inter alia, reversed the district court's award of $44,000 actual damages and $1,200,000 punitive damages on Defendant Hamiltons' Oklahoma state fraud claim against Third-Party Defendant NationsBank. The facts of this case are set forth in that opinion and need not be restated here except to the extent necessary to our discussion of the issues. Suffice it to say that in Hamilton we remanded the case to the district court to reconsider its finding of fraud against NationsBank in light of facts which the district court apparently overlooked. We explained:

> Here, the district court found that NationsBank committed fraud through its agent, Warren, by knowingly making materially false representations regarding repairs between March and October 1991. However, the record reflects that NationsBank spent in excess of $20,000 on repairs to the property during the period in which the district court found fraudulent conduct.

> Unfortunately, we cannot discern from the record whether the district court considered the effect, if any, of the $20,000 in expenditures on the Hamiltons' fraud claim under the law of Oklahoma . . . even though the issue as to whether the Hamiltons are entitled to recover on their fraud claim was clearly presented.

2

Hamilton, 58 F.3d at 1529. We rejected, however, NationsBank's claim that Oklahoma law prohibits an award of punitive damages in any case arising out of contract. We concluded that the Hamiltons might recover punitive damages if, "on remand, the district court again finds that NationsBank committed the independent willful tort of fraud" under Oklahoma law. Id. at 1530. On remand, the district court again found just that, and reinstated its award of $44,000 actual damages and $1,200,000 punitive damages against NationsBank. The district court found that the $20,000 in expenditures to which we referred in our prior opinion were not "part of a good faith ongoing effort to fulfill Mr. Warren's false promises to the Hamiltons and the Bank's total repair obligations under the Lease, but instead as part of Mr. Warren's deceptive scheme."

Aplt. Supp. App. at 897.[1]

---

[1]     The district court described the scheme as follows:

The goal of Mr. Warren's deceitful plan was to induce the Hamiltons to make repairs at their own expense that the Bank was obligated to make under the Lease. Mr. Warren hoped for the Bank to benefit from the Hamiltons' assumption of repair and maintenance costs through one of three possible scenarios: (a) sale of the property to the Hamiltons without fair adjustment to the purchase price for the value of the Hamiltons' expenditures; (b) a new lease on terms significantly less advantageous to the Hamiltons with respect to repair and maintenance obligations; or (c) eviction of the Hamiltons from the property after they had made significant expenditures and improvements to the property.

Aplt. Supp. App. at 897.

NationsBank again appeals claiming that (1) Oklahoma law does not recognize a cause of action in fraud for entering into a contract with no intention to perform where acts in furtherance of performance occur; (2) the evidence was insufficient to support the district court's finding of fraud; (3) the district court imposed punitive damages for an improper purpose; and (4) the punitive damage award is grossly excessive. NationsBank requests reversal of the fraud judgment or, in the alternative, a remittitur on the punitive damage award. Our jurisdiction arises under 28 U.S.C. § 1291. We review a district court's determination of state law de novo. Salve Regina College v. Russell, 499 U.S. 225, 231 (1991). Similarly, we review the propriety of a punitive damage award de novo. Patton v. Tic United Corp., 77 F.3d 1235, 1243 (10th Cir.), cert. denied, 116 S. Ct. 2525 (1996). We will not disturb a district court's findings of fact, however, unless those findings are clearly erroneous giving due regard to the district court's opportunity to determine the witnesses' credibility. Fed. R. Civ. P. 52(a). Applying these standards, we affirm in part and reverse in part.

I.

NationsBank asserts that Oklahoma law precludes a finding of fraud because the Bank took actions in furtherance of its contractual obligation to repair the rental property. NationsBank advanced this argument in its first appeal as well. Hamilton, 58 F.3d at 1528. We agree with NationsBank's interpretation of Oklahoma law. Indeed, in Furr v. Thomas, 817 P.2d 1268, 1272 (Okla. 1991), the Oklahoma Supreme Court held that to

4

avoid a claim for the independent tort of fraud in a case arising out of contract, subsequent actions of the promisor "must be toward the fulfillment of a promise." Because in Furr the promisor admitted that his subsequent actions were not in furtherance of his promise to perform under the contract, the court concluded that the question of fraud was properly submitted to the jury. Id.

Although NationsBank properly interprets Oklahoma law, the problem with NationsBank's argument is that the district court did not find that the Bank's undertaking of certain repairs was in furtherance of its promise to perform its contractual obligations to the Hamiltons. To the contrary, the district court expressly found on remand that--

> The Bank undertook this work not as part of a good faith ongoing effort to fulfill Mr. Warren's false promises to the Hamiltons and the Bank's total repair obligations under the Lease, but instead as part of Mr. Warren's deceptive scheme. This gesture of "good faith," like the moratorium on rent payments Mr. Warren unilaterally imposed in April 1991, was designed to string the Hamiltons along until he could either convince them to buy the property or coerce them to sign a new lease.

Aplt. Supp. App. at 897-98 (emphasis in original).

In Oklahoma, the parties' purpose and intent to a disputed contract is a question of fact. See Continental Natural Gas, Inc. v. Midcoast Natural Gas, Inc., 935 P.2d 1185, 1188 (Okla. Civ. App. 1996). In our prior opinion, we recognized that the question of whether part performance of a contract was "toward the fulfillment of a promise" under Oklahoma law was a question of fact which the district court must decide on remand. Hamilton 58 F.3d at 1529-30. If Oklahoma law absolutely barred the Hamiltons' fraud

5

claim, a remand would have been unnecessary.  Because our review of the record reveals that the district court's finding as to NationsBank's motive in undertaking certain repairs of the property is not clearly erroneous, but is a subject upon which reasonable minds might differ given the conflicting testimony of the parties, we will not disturb the court's finding.  Accordingly, NationsBank's first argument must fail.[2]

## II.

NationsBank next asserts that the evidence was insufficient to support the district court's finding of fraud.  To establish fraud, Oklahoma law requires the proponent to show by clear and convincing evidence "a false material representation made as a positive assertion which is either known to be false, or made recklessly without knowledge of the truth, with the intention that it be acted upon by a party to his or her detriment."  Rainbow Travel Serv. v. Hilton Hotels Corp., 896 F.2d 1233, 1240 (10th Cir. 1990).  In Tice v. Tice, 672 P.2d 1168, 1171 (Okla. 1983), the Oklahoma Supreme Court set forth the basis for a fraud claim based on failure to fulfill a promise:

---

[2]    Even if we were to view the district court's determination regarding NationsBank's motive as a mixed question of fact and law, "the quintessentially factual question of intent" predominates, requiring us to apply the clearly erroneous standard of review.  See United States v. Richard, 969 F.2d 849, 853 (10th Cir. 1992) (internal quotations and citation omitted).

Fraud can be predicated upon a promise to do a thing in the future when the promisor's intent is otherwise. The basis of fraudulent misrepresentation is the creation of a false impression and damage sustained as a natural and probable consequence of the act charged. The fraudulent representation need not be the sole inducement which causes a party to take the action from which the injury ensued. The key is that without the representation the party would not have acted. The liability for misrepresentation depends upon whether the person relying thereon was in fact deceived.

In this case, the district court expressly found all the elements necessary to establish fraud under Oklahoma law. The district court found that NationsBank, through Warren, made representations that the Bank would make certain repairs which Warren knew to be false. The court also found that NationsBank did this with the intent that the Hamiltons would detrimentally rely on such representations. The court found:

> Beginning in March 1991 and continuing until October 2, 1991, Mr. Warren repeatedly made false promises that all necessary repairs would be made and that they would be made in a timely fashion. He made these promises with the intent not to perform them, but with the knowledge that nonperformance, and specifically failure to repair critical items or making untimely repairs, would be disastrous to the Hamiltons' business plan. Mr. Warren's true intent was to take care of only a few items immediately and to delay making repairs that he knew were necessary to preserve or restore the functional integrity of the property. By delay, Mr. Warren hoped to avoid incurring additional repair and maintenance costs until he succeeded in extricating the Bank from its onerous obligation under the Lease to repair and maintain "all functions of the property." He also intended to put pressure on the Hamiltons.

Aplt. Supp. App. at 896-97.

Unquestionably, the evidence conflicted in this case. The district court chose to believe the Hamiltons rather than NationsBank. The court expressly rejected Warren's testimony that he never intended to deceive the Hamiltons as unbelievable:

7

> The Court's finding that the Bank, acting through Mr. Warren, acted fraudulently is based in large part on the Court's observation of Mr. Warren's demeanor and manner of testifying. Watching him, the Court was firmly convinced that he was a deceitful, calculating opportunist in his dealings with the Hamiltons. He was well aware of and purposefully exploited the Hamiltons' particular vulnerability. After becoming familiar with the Hamiltons' situation, Mr. Warren capitalized on the weak points in their business plan, namely, that they could ill afford to wait for the Bank to make numerous basic repairs nor abandon the considerable investment they had already made in starting up their business on the property.

Aplt. Supp. App. at 898-99.

As in its prior appeal, Hamilton, 58 F.3d at 1528-30, NationsBank argues that its expenditure of over $20,000 in June 1991 to repair the property's security system, sprinkler system, and guest house floor illustrates that NationsBank did not intend to deceive the Hamiltons. We agree that this evidence may be viewed in that way. However, viewing the evidence in a light most favorable to the prevailing party as we must, see Rainbow, 896 F.2d at 1239, the evidence showed that NationsBank assured the Hamiltons when they executed the lease that the Bank would make all necessary repairs to the property. Aple. App. at 87, 209. The Bank even placed a $1,000 per year limit on the amount the Hamiltons were required to expend to maintain the property. Aplt. App. Vol. I at 6. Yet, NationsBank did not authorize any repairs in 1992. Aple. App. at 68. As of February 1993, the property needed repairs costing a total of $109,860. Aple. App. at 1-7, 234. Sandra Hamilton described some of the problems which arose:

> [W]hen we moved in, there were bullet holes everywhere, . . . none of the doors would open, the cabinet doors were falling off . . . in the kitchen and the utility room. Plumbing just kept--it was just one thing after another.

8

You'd get a toilet fixed, another toilet would break; the sink would break; the sewers kept backing up because they were full of just stuff from sitting there so long. . . . [T]he electric was really a problem, there were live wires everywhere inside the house. Light fixtures were broken. Ceiling fans wouldn't work, they had just frozen up . . . . We had shorts everywhere. The Jacuzzi in my room shorted out, flames flicked up the wall. I bumped my arm against one of the light switches in my bathroom and it knocked me across the room at one point. Another point, kitchen range shorted out, fumes everywhere. The kitchen stove caught on fire and literally burned up. Most every appliance broke. The air conditioners all went out at one time or another. After the air conditioner got fixed, then the heaters broke. . . . I spent the entire winter of '91 and the entire winter the following year working in a coat with a fire in the fireplace, when I had somebody that could go get logs to build one, because we had absolutely no heat for two whole winters. We had no oven for nine months. . . . The scorpions were falling out of the light fixtures, and of course we still had the wasp problem. . . . The place was infested with wasps. And it was one of the things we specifically addressed before we even moved in.

Aple. App. at 89-90.

The evidence supports the district court's finding that the Bank did not make the necessary repairs in accordance with the lease, and refused to do so unless the Hamiltons entered into a more definite lease agreement under terms more advantageous to the Bank. Aple. App. at 214; Aplt. App. Vol. I at 103-04. NationsBank admitted that the lease had "not turned out to be a good deal for the bank and we want[ed] out." Aplt. App. Vol. II at 268. The Hamiltons in the meantime made over $100,000 worth of improvements to the property during the term of the lease, and as a result are now broke. Aple. App. at 251-52, 319.

On appeal, our inquiry is limited to whether the record contains evidence to support the district court's findings, and we believe this record amply does. How we

9

might decide this case in the first instance is of no import. Under our standard of review, we will overturn the district court's findings "only if our review of the record leaves us with a definite and firm conviction that a mistake has been made." ITT Life Ins. Corp. v. Farley, 783 F.2d 978, 981 (10th Cir. 1986). It is exclusively within the district court's province to (1) appraise credibility, (2) determine the weight to be afforded testimony, (3) draw reasonable inferences from the facts, (4) resolve conflicts in the evidence, and (5) ultimately set forth findings of fact and conclusions of law. We are not empowered to undertake a review of the evidence which would amount to a trial de novo. Accordingly, we uphold the district court's finding of fraud against NationsBank.

## III.

NationsBank claims that if we uphold the district court's finding of fraud, we still must issue a remittitur reducing the court's $1,200,000 punitive damage award because the district court improperly awarded punitive damages to compensate the Hamiltons rather than punish NationsBank. According to NationsBank, the district court committed error warranting a remittitur when the court stated on the record:

> The purpose of the Court's award of punitive damages was to grant recompense to the Hamiltons where the standard damages calculations would not. The amount awarded was the quantum the Court felt would sufficiently compensate the Hamiltons for their treatment by plaintiff and third party defendant and for any hardships they suffered as a result.

Aplt. App. Vol I. at 45-A, 3-4.

The district court's authority to impose punitive damages in this case arose under 23 Okla. Stat. Ann. § 9A (West 1987) (repealed 1995). Section 9A allows an award of punitive damages under Oklahoma law "for the sake of example, and by way of punishing the defendant," to exceed an award of actual damages where the court finds "that there is clear and convincing evidence that the defendant is guilty of conduct evincing a wanton or reckless disregard for the rights of another, oppression, fraud or malice, actual or presumed . . . ." The Oklahoma Supreme Court has emphasized that although an award of punitive damages may result in a windfall to the plaintiff, the purpose of such damages in Oklahoma is to punish the offender and deter others from like wrongs for the benefit of society. Dayton Hudson Corp. v. American Mutual Liability Ins. Co., 621 P.2d 1155, 1158 (Okla. 1980).

Even assuming without deciding that the district court's comments to which NationsBank objects were improper, these comments cannot be viewed in isolation. In its Journal Entry of Judgment prior to NationsBank's first appeal, the district court expressly stated, consistent with Oklahoma law, that the award of punitive damages against NationsBank was to set an example and punish the Bank: "The fraud by Nation's agent, Ward Warren, was shown by clear and convincing evidence and was so egregious, wanton and malicious that punitive damages . . . should be awarded against Nations to set an example and to punish Nations for the benefit of the public." Aptl. App. Vol I at 50. On remand, the district court reiterated its previous finding: "Mr. Warren's fraudulent

11

conduct was so egregious, wanton and oppressive as to warrant an award of punitive damages as determined by the Court's previous findings." Aplt. Supp. App. at 900. Accordingly, we reject NationsBank's claim that the district court imposed punitive damages for an improper purpose under Oklahoma law.

IV.

Whether the punitive damage award violates the Federal Constitution is a question separate and apart from Oklahoma state law. Therefore, we look to United States Supreme Court cases addressing the limits of punitive damage awards under the due process clause of the Fourteenth Amendment. Based on these cases, we believe it is necessary to reduce substantially the punitive damage award imposed by the district court. The district court awarded $1,200,000 in punitive damages, as compared with the $44,000 in compensatory damages awarded the Hamiltons on their fraud claim. The ratio between the punitive and actual damages awards, which is approximately 27:1, is unconstitutionally excessive under the Supreme Court's decision in BMW of North America, Inc. v. Gore, 116 S. Ct. 1589 (1996), and our subsequent decision in Continental Trend Resources, Inc. v. OXY USA, Inc., 101 F.3d 634 (10th Cir. 1996), cert. denied, 117 S. Ct. 1846 (1997).

Selecting the maximum constitutionally permissible punitive damage ratio in a given case is a difficult process. The guidelines offered to date by the Supreme Court in this regard are somewhat murky. Nonetheless, several of the relevant criteria are clear.

12

In BMW, the Court identified three "guideposts" for evaluating the constitutionality of a punitive damage award: the "reprehensibility" of the defendant's conduct; the ratio between punitive damages and the actual or potential harm suffered; and the difference between the punitive damage award and the civil and criminal penalties available for comparable conduct. See BMW, 116 S. Ct. at 1599-1601.

As a threshold matter, the Supreme Court has indicated that there is a ratio above which punitive damage awards will rarely be upheld. The Court has stated that a 4:1 ratio between punitive and actual damages is "close to the line." Pacific Mut. Ins. Co. v. Haslip, 499 U.S. 1, 23, 24 (1991). Although the Court later upheld an award that was 526 times greater than the compensatory damages, TXO Production Corp. v. Alliance Res. Corp., 509 U.S. 443 (1993), the BMW Court explained that award by stating that "in upholding the $10 million award in TXO, we relied on the difference between that figure and the harm to the victim that would have ensued if the tortious plan had succeeded. That difference suggested that the relevant ratio was not more than 10 to 1." BMW, 116 S. Ct. at 1602. In OXY, we interpreted these decisions to mean that in "economic injury cases if the damages are significant and the injury not hard to detect, the ratio of punitive damages to the harm generally cannot exceed a ten to one ratio." OXY, 101 F.3d at 639. This is an economic injury case, and there do not appear to be any "hard to detect" elements of the Hamiltons' damages, as the $44,000 actual damage award reflects the costs incurred by the Hamiltons in relying on the bank's promise to perform the repairs.

13

Thus, under OXY, the 27:1 ratio at issue here is unconstitutionally excessive, and the award should at least be reduced to a 10:1 ratio.

However, even a 10:1 ratio will be unconstitutionally excessive in a broad range of cases. To determine the proper ratio in a given case, we must consider what the Supreme Court called "[p]erhaps the most important indicium of the reasonableness of a punitive damages award," "the degree of reprehensibility of the defendant's conduct." BMW, 116 S. Ct. at 1599. Under OXY, in assessing the reprehensibility of a defendant's conduct, we ask whether the conduct: "causes economic harm rather than physical harm; would be considered unlawful in all states; involves repeated acts rather than a single one; is intentional; involves deliberate false statements rather than omissions; and is aimed at a vulnerable target." 101 F.3d at 638. We also ask whether the defendant engaged in violent behavior. BMW, 116 S. Ct. at 1600.

As in OXY, some of the relevant reprehensibility factors are present in this case. NationsBank was found to have committed fraud, a tort recognized by every state. The district court found that NationsBank made deliberate false statements, that its conduct was intentional, and that the bank knew the Hamiltons were in a financially vulnerable position when the statements were made. On the other hand, this case, like OXY, involves only economic harm rather than harm to the health or safety of individuals. "[T]orts causing only economic injury [are] less worthy of large punitive damage awards than torts inflicting injuries to health or safety." OXY, 101 F.3d at 638. When the injury

14

is economic, and particularly when it arises out of a contractual relationship where the parties can and should contractually protect themselves by providing for explicit remedies in the event of breach, the permissible ratio of punitive damages to actual damages should be relatively modest. Further, the fact that NationsBank's conduct here was non-violent makes it less reprehensible.

In addition, NationsBank's treatment of the Hamiltons arose from a single contractual event whereby the bank leased the property to the Hamiltons. Although the dispute concerning the bank's performance of its promises stretched out over some time, the alleged act of fraud -- the making of a contractual promise to make certain repairs -- was a single event arising from a single contractual relationship. Compare OXY, 101 F.3d at 638 (noting that "coercing weaker competitors" was "OXY's method of conducting business"). Thus, the reprehensibility factor here militates against punitive damages that represent a substantial multiple of compensatory damages.

Second, we look to see whether the state has provided for civil or criminal penalties for comparable conduct that would alert a defendant that it might face substantial liabilities beyond mere compensatory damages if it engages in such conduct. Here, no one suggests that there were any civil or criminal penalties applicable to the conduct engaged in by NationsBank. Instead, the Hamiltons' fraud claim arises out of an alleged breach of contract which, under Oklahoma law, will only rarely sustain a tort cause of action. This suggests that NationsBank was not on notice that its conduct could

15

give rise to substantial non-compensatory liability.  Accordingly, this factor also drives us to conclude that the maximum constitutionally permissible ratio of punitive to actual damages is fairly low in this case.

A factor that cuts the other way, however, is the relatively small size of the actual damage award of $44,000 in comparison to the size of the defendant.  BMW, 116 S. Ct. at 1602.  Although we have been cautioned that the size of the defendant should not ordinarily be a very significant factor, we have also concluded that it is not irrelevant either.  OXY, 101 F.3d at 641.  NationsBank is undeniably a large financial institution, and the $44,000 in fraud damages cannot be expected to serve as much of a deterrent to any future misconduct.  Hence, constitutionally, a higher ratio of punitive to actual damages is warranted here than would be the case if the base level of compensatory damages were a significantly higher figure relative to the size of the defendant.

In OXY, we held that the "maximum constitutionally permissible" punitive damage to actual damage ratio was 6:1 under the facts of that case.  101 F.3d at 643.  In light of that case, we believe that no higher ratio can be constitutionally sustained in this case.  Accordingly, we reverse the $1,200,000 punitive damage award entered by the district court, and order a remittitur to $264,000, an amount representing six times the actual damages suffered by the Hamiltons.[3]

---

[3] NationsBank also argues that the size of the punitive damage award violates Oklahoma law.  Oklahoma has not hesitated to strike down or order remittitur in cases where punitive damages have been excessive.  Chandler v. Denton, 741 P.2d 855, 868

16

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

---

(Okla. 1987); American National Bank & Trust v. BIC Corp., 880 P.2d 420, 427 (Okla. 1994).  In those cases, the Oklahoma courts have observed that the Oklahoma punitive damages statute "shall be strictly construed."  We believe that Oklahoma  would determine that the punitive damage award here was excessive and it would order remittitur down to a constitutional level, which we have found here not to exceed a ratio of 6:1, or $264,000.

EBEL, Circuit Judge, dissenting:


I respectfully dissent from Parts I & II of the court's opinion in this case because I believe the district court failed to account adequately for Oklahoma's general reluctance to award tort remedies in what are essentially breach of contract actions. In my view, the over $20,000 in expenditures by NationsBank were clearly subsequent actions "toward the fulfillment of a promise" under the Oklahoma Supreme Court's decisions in Furr v. Thomas, 817 P.2d 1268, 1272 (Okla. 1991), and Citation Co. Realtors v. Lyon, 610 P.2d 788, 790-91 (Okla. 1980).

As a general matter, tort remedies, such as punitive damages, are not available in breach of contract actions. III E. Allan Farnsworth, Farnsworth on Contracts § 12.8 (1990). On the other hand, Oklahoma, like most states, allows tort recovery in situations where the defendant's conduct amounts to an independent tort, such as fraud, as opposed to a simple breach of contract.[1] Specifically, a fraud claim is available where

---

[1]Oklahoma has also allowed recovery for tortious breach of contract, but only in the insurance context for a bad faith refusal to pay under a policy. Christian v. American Home Ins., 577 P.2d 899, 904 (Okla. 1977); McCorkle v. Great Atlantic Ins. Co., 637 P.2d 583, 588 (Okla. 1981). The Oklahoma Supreme Court has so far declined to extend the tortious breach theory to other settings. Rogers v. Tecumseh Bank, 756 P.2d 1223, 1226 (Okla. 1988) (refusing to recognize tortious breach of commercial loan agreement and noting that "[t]o impose tort liability on a bank for every breach of contract would only serve to chill commercial transactions").

the promise to act in the future is accompanied by an intention not to perform and the promise is made with the intent to deceive the promisee into acting where he otherwise would not have done so. The gist of the rule is not the breach of promise but the fraudulent intent of the promisor at the time the pledge is made not to perform the promise so made and thereby deceive the promisee.

Citation, 610 P.2d at 790. However, Oklahoma has placed an important limitation on this rule, allowing recovery only in situations where the defendant has not performed subsequent actions "toward the fulfillment of the promise." Furr, 817 P.2d at 1272.

The majority affirms the district court's conclusion that NationsBank defrauded the Hamiltons by promising to perform repairs to the property without intending to complete performance of those repairs, despite the fact that the bank performed in excess of $20,000 in repairs after the promise was made. The district court's conclusion was based on its assessment of Mr. Warren's credibility, and its finding that Warren's promise to complete the repairs was only part of a "deceptive scheme." Aplt. Supp. App. at 897. Unlike the majority, I do not believe that the district court's findings regarding the bank's subjective motivations are dispositive, so long as the bank took objective steps toward the fulfillment of its contractual promise, as it did.

The Oklahoma case law distinguishes between situations where the defendant has taken objective steps toward the completion of the contract, and cases where such steps have not been taken. In the former situation, any fraud claim is completely barred, whereas in the latter situation a fraud claim will lie if the plaintiff can show the other elements of such a claim. Thus, in Citation, when the plaintiff alleged that a realty

2

company fraudulently misrepresented its intent to sell certain condominium units, the Oklahoma Supreme Court affirmed the trial court's grant of summary judgment in favor of the defendant brokerage based on the "simple fact" that the company attempted to sell the condominium units at issue. 610 P.2d at 790. The attempts to sell the units "remove[d] the issue from the concept of fraud through a promise to execute a future act made mala fide and relegate[d] the failure to perform to simple nonperformance of a promise." Id. Notably, in affirming the grant of summary judgment, the court did not engage in any analysis of the company's subjective motivations in attempting to sell the units, or make any attempt whatever to evaluate the quality of those efforts.

In Furr, on the other hand, the Oklahoma Supreme Court recognized a valid fraud claim where the actions taken by the defendant after the contract was entered into were not directed toward the fulfillment of the promises in the contract. In that case, the defendant, a real estate developer, promised "to construct a two mile all-weather smooth service road to serve the development." 817 P.2d at 1269. Instead of building such a road, the defendant, who conceded he had decided not to build the promised road before he finished selling the lots, built a gravel road. Id. at 1272. Because there was no showing of any action by the defendant "toward the fulfillment of the promise" to build a smooth, all-weather road, the Oklahoma Supreme Court concluded that the fraud claim was properly submitted to the jury. Id.

3

In this case, it is undisputed that NationsBank completed over $20,000 worth of repairs to the Hamiltons' property during the relevant time period, and that the items repaired were among those specifically mentioned on the list of needed repairs prepared jointly by both the Hamiltons and the bank. As of April 1991, the list of needed repairs prepared jointly by the Hamiltons and the bank estimated that the total cost of repairs would be $37,955.51. The repairs completed by the bank were objective steps toward the fulfillment of the bank's contractual promise, and the district court did not find otherwise. Consequently, as in Citation, no fraud claim is available under the undisputed facts of this case.

Further, in view of the substantial progress the bank made toward completing its repair obligations, I believe it was clearly erroneous for the district court to characterize that performance as "token" and "spurious." Even assuming that a token act will not satisfy the Citation/Furr requirement of acts toward the fulfillment of a promise, the over $20,000 in repairs actually completed by the bank in this case represented over one-half of the estimated $37,955.51 total repair cost. Half performance cannot reasonably be considered token performance. Accordingly, I would reverse the district court judgment in favor of the Hamiltons on the fraud and punitive damages claim, and conclude that on these facts the Hamiltons' only valid claim against the bank was on a breach of contract

4

theory.[2]  However, since the majority has concluded that fraud and punitive damages are appropriate, I conclude, in part IV of the Court opinion, that the punitive damages awarded are constitutionally excessive and must be reduced on remittitur.

---

[2]Contrary to the majority's assertion that "a remand would have been unnecessary" were the Hamiltons' fraud claim absolutely barred by Oklahoma law, our prior opinion clearly indicates that a remand was necessary because we could not "discern from the record whether the district court considered the effect, if any, of the $20,000 in expenditures on the Hamiltons' fraud claim under the law of Oklahoma as stated in Citation and Furr." FDIC v. Hamilton, 58 F.3d 1523, 1529 (10th Cir. 1995). At the time of our prior decision, the Hamiltons continued to dispute whether the bank had performed any repairs. Id. n.3. If, on remand, the district court had concluded that the repairs performed by the bank were not objective acts toward the fulfillment of the bank's promise, the Hamiltons' fraud claim would have been valid. Thus, a remand was necessary.

BALDOCK, Circuit Judge, dissenting as to Part IV.

I do not agree that the punitive damage award in this case is constitutionally impermissible.[1] In <u>Pacific Mutual Life Insurance Co. v. Haslip</u>, 499 U.S. 1 (1991), the Court upheld an Alabama state court's punitive damages award four times greater than the actual damage award. The Court stated, however: "We need not, and indeed cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." <u>Id.</u> at 18. Nevertheless, this court attempts to do just that.

Illustrating the difficulty in drawing any clear lines, in <u>TXO Production Corp. v. Alliance Resources Corp.</u>, 509 U.S. 443 (1993) (plurality), the Court upheld a punitive damage award of $10,000,000 and an actual damage award of $19,000--a ratio of 526 to 1. Rejecting TXO's argument that the punitive damage award was grossly excessive, the Court stated that a fact finder "imposing a punitive damage award must make a qualitative assessment based on a host of facts and circumstances unique to the particular case before it. Because no two cases are truly identical, meaningful comparisons of such awards are difficult to make." <u>Id.</u> at 457. Thus, from <u>TXO</u> we must take the lesson that a

---

[1] As an initial matter, I do not believe that we need reach the issue of the punitive damage award's excessiveness under the Federal Constitution. Footnote three of the court's opinion plainly states that the award is excessive under Oklahoma law. Why then do we need to determine that the award is also excessive under the Federal Constitution? <u>See</u> <u>Specter Motor Services, Inc. v. McLaughlin</u>, 323 U.S. 101, 105 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable.").

punitive damage award of over 500 times actual damages is not per se unconstitutional, and that the propriety of a punitive damage award requires a very fact specific, case by case analysis.

In 1996, the Supreme Court decided BMW of North America, Inc. v. Gore, 116 S. Ct. 1589 (1996). The Court, in a 5 to 4 decision, reversed and remanded a $2,000,000 punitive damage award 500 times greater that the actual damage award of $4,000 against BMW. In so doing, the Court attempted to provide some guidelines for determining when a punitive damage award runs afoul of due process as "grossly excessive." The Court first explained that any sanction the state imposes upon a tortfeasor must be designed to protect its own consumers and economy, rather than the consumers and economies of other states. Id. at 1597. Second, the tortfeasor must have fair notice that the subject conduct may give rise to punitive measures. Id. at 1598. Third, the tortfeasor must have fair notice as to the potential magnitude of such measures. Under the third guideline, the Court identified three guideposts: (1) the degree of reprehensibility of the tortfeasor's conduct; (2) the disparity between the harm or potential harm and the punitive damage award; and (3) the difference between the punitive damage award and the authorized civil penalties. Id. The Court, however, again rejected the notion of a categorical approach applicable to all cases:

2

> Of course, we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula . . . . It is appropriate, therefore, to reiterate our rejection of a categorical approach. Once again, "we return to what we said . . . in <u>Haslip</u>: 'We need not, and indeed cannot, draw a mathematical bright line between the constitutionally acceptable and constitutionally unacceptable that would fit every case. . . .'" <u>TXO</u>, 509 U.S. at 458 (quoting <u>Haslip</u>, 499 U.S. at 18). <u>In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis.</u>

<u>Id.</u> at 1602-03 (emphasis added).

In this case NationsBank does not assert, and has no basis for asserting, that the district court sought to protect other than Oklahoma interests in awarding punitive damages. Nor does NationsBank argue that it did not have fair notice that fraudulent conduct in Oklahoma might give rise to punitive measures. <u>See</u> <u>Continental Trend Resources, Inc. v. OXY USA Inc.</u>, 101 F.3d 634, 638 (10th Cir. 1996) ("It has long been established in Oklahoma . . . that tortious behavior that is particularly egregious will warrant punitive damages."), <u>cert. denied</u>, 117 S. Ct. 1846 (1997). Instead, NationsBank's principle argument, which the court accepts, is that the district court's punitive damage award is "grossly excessive," because the award is twenty-seven times greater than the $44,000 actual damage award.[2] I disagree.

---

[2] NationsBank also continues to assert that the evidence does not support the district court's finding of fraud, which in turn cannot support the court's award of punitive damages. The insufficiency of the evidence, however, is a proposition we have rejected throughout the opinion.

3

In BMW, the Court focused on the degree of reprehensibility of the tortfeasor's conduct as " [p]erhaps the most important indicium of the reasonableness of a punitive damage award." The Court noted that deceit is more reprehensible than negligence and that "infliction of economic injury, especially when done intentionally through affirmative acts of misconduct , . . . or when the target is financially vulnerable, can warrant a substantial penalty." BMW, 116 S. Ct. at 1599. Similar concerns are echoed in TXO. See TXO, 509 U.S. at 462. In this case, the district court found that NationsBank, through Warren, had intentionally deceived the Hamiltons, knowing that they were financially vulnerable. Aplt. Supp. App. at 896-99. Compare BMW, 116 S. Ct. at 1601 ("[T]he record in this case discloses no deliberate false statements, acts of affirmative conduct, or concealment of evidence of improper motive . . . ."), with TXO, 509 U.S. at 462 (stating large punitive damage award was supported by tortfeasor's "fraud, trickery and deceit"). As we previously have said, the record supports these findings.

The court states that in cases of purely economic injury, the ratio of punitive damages to actual harm cannot exceed 10 to 1. Aside from the fact that the language of the Constitution contains no support for this conclusion and Supreme Court precedent

specifically refuses to prescribe rigid mathematical ratios,[3] this case is much more than one of purely economic injury. Sandra Hamilton testified that, among other problems, she had no heat in the house for two winters, electrical units in the house repeatedly shorted out, an electric shock threw her across the bathroom, and the house was infested with scorpions and wasps. Aple. App. at 89-90. I wonder whether it would make any difference to this court if the Hamiltons had caught pneumonia, been electrocuted, or seriously stung. Does a substantial award of punitive damages require that we await such a tragic occurrence? Surely not! A punitive damage award should be based on exposure to harm rather than actual harm. NationsBank's wanton conduct exposed the Hamiltons and anyone else on the property to an unwarranted risk of personal injury. It is not due to the Bank's conduct that nobody was personally injured. The court's conclusion that NationsBank's conduct posed no threat to the health or safety of the Hamiltons cannot be taken seriously.

Moreover, we must not forget the punitive nature of punitive damages. The wealth of the tortfeasor remains a relevant and important consideration in determining the

---

[3] I view the recent trend in the federal courts setting arbitrary ratios to decide the constitutionality of punitive damage awards as unwarranted conservative judicial activism--perhaps a lesser known evil than, but every bit as menacing as, its first cousin liberal judicial activism. If a court's construction of the purportedly applicable constitutional provision, here the Due Process Clause of the Fourteenth Amendment, has no support in its text or history, it is difficult to apply and yields unprincipled results. See generally Wechsler, Toward Neutral Principles of Constitutional Law, 73 Harv. L. Rev. 1 (1959).

propriety of a punitive damage award. <u>TXO</u>, 509 U.S. at 464; <u>OXY USA</u>, 101 F.3d at 641. The record indicates that NationsBank's net worth is in excess of $8.7 billion. Aplt. App. Vol III at 689. A $1,200,000 award represents only 14/1000 of one percent of NationsBank's net worth. I conclude that the degree of reprehensibility of NationsBank's conduct, the degree of difficulty in estimating the Hamiltons' actual damages,[4] and NationsBank's significant worth are sufficient to justify the district court's punitive damage award against NationsBank. I would affirm the judgment of the district court in all respects.

---

[4] In part IV of the opinion, the court states that "there do not appear to be any 'hard to detect' elements of the Hamiltons' damages, as the $44,000.00 actual damage award reflects the costs incurred by the Hamiltons in relying on the bank's promise to perform the repairs." This statement is directly contrary to the district court's conclusion that standard damage calculations in this case would not adequately compensate the Hamiltons for the damages they incurred. Aplt. App. Vol I at 45-A, 3-4.